IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NICHOLAS M. MOSS,

                    Petitioner,                                    **8:20CV474**

          vs.

ROB JEFFREYS,                                           **MEMORANDUM AND ORDER**

                    Respondent.

This matter is before the Court and is ripe for review on Nicholas M. Moss' ("Moss") Petition for Writ of Habeas Corpus (the "Petition"), Filing No. 1, and a brief in support, Filing No. 18, Respondent's Answer, Filing No. 13, brief in support, Filing No. 14, and state court records, Filing No. 10 and Filing No. 54.

After careful review, the Court will grant the Petition, in part, in accordance with this Memorandum and Order. All of the remaining Claims and Subparts will be dismissed with prejudice. The execution of the writ of habeas corpus shall be stayed for 90 days from the date of this order to permit the State of Nebraska to grant Moss a new trial in accordance with this Memorandum and Order.

## I. CLAIMS

Summarized and condensed,[1] and as set forth in the Court's initial review order, Filing No. 6 at 1-3, Moss asserted the following claims that were potentially cognizable in this Court:

---

[1] While no objections to the Court's summary and condensation were filed by the parties, the summary is provided for ease of reference and is not binding for purposes of further discussion by the parties of the claims as pleaded or later analysis by this Court.

Claim One:    [Moss] was denied due process and the effective assistance of counsel because (1) the trial court failed to hold a hearing to determine whether [Moss] should wear a stun belt during trial; (2) counsel failed to object to [Moss] having to wear a stun belt; (3) the trial court failed to declare a mistrial or admonish the jury when [Moss] was electrocuted by a stun belt in the jury's presence; (4) counsel failed to move for a mistrial or request a jury admonishment regarding the stun belt electrocution; and (5) counsel failed to raise the stun belt issue on appeal.

Claim Two:    The state destroyed material exculpatory evidence contained within [Moss'] cell phone in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and [Moss'] due process rights.

Claim Three:    [Moss] was denied due process and the effective assistance of counsel because the trial court imposed an excessive sentence based on a presentence investigation report containing incorrect information of [Moss'] criminal history and counsel failed to obtain the report for [Moss] to review.

Claim Four:    [Moss] was denied a fair trial and the effective assistance of counsel because (1) the trial court erred in sustaining the State's objections to the testimony of witnesses Roger Rankin, Petar Pollard, Jason Owens, and Austin Aurterburn[2] and because counsel (2) failed to endorse and introduce the testimony of Pollard, Aurterburn, Owens, and Rankin at trial to aid [Moss'] defense; (3) failed to gain proper out-of-state service of witness Pollard to compel his attendance and testimony at trial; and (4) failed to make an offer of proof regarding the testimony of excluded witnesses Pollard, Aurterburn, Owens, and Rankin.

Claim Five:    The trial court erred by not discharging the case for a speedy trial violation.

Claim Six:    The trial court erred in not granting a directed verdict for insufficiency of evidence.

Claim Seven:    [Moss] was denied the effective assistance of counsel because counsel (1) failed to properly offer the testimony of

---

[2] Moss repeatedly spells the name of this potential witness as "Austin Aurterburn", *see e.g.* Filing No. 1 at 53, not "Arterburn" as the state court of appeals does, *see* Filing No. 10-3 at 15. As it is unclear to this Court which is the correct spelling, the Court shall not change the spelling as utilized by the parties or the state courts, but shall refer to this potential witness as "Aurterburn" for the remainder of this Memorandum and Order when conducting its analysis.

Jennifer York regarding the destruction of [Moss'] cell phone; (2) failed to provide a meaningful defense; (3) failed to lay proper foundation to introduce the victim's cell phone records; (4) failed to properly document the exculpatory nature of the information in [Moss'] cell phone that was destroyed; (5) failed to call prosecutor Jennifer Hessig as a witness at the motion to dismiss evidentiary hearing regarding her alleged requests for a PIN code; and (6) failed to withdraw and testify at the hearing on the motion to dismiss regarding the lack of request by the prosecutor for the cell phone PIN code.

## II.  BACKGROUND AND PROCEDURAL HISTORY

### A.  Pre-trial[3]

Moss and "K.E." were in a dating relationship for approximately 3 years.  In April 2015, an event occurred that prompted K.E. to apply for a domestic violence protection order against Moss. The protection order was issued on May 3, and Moss was served with the protection order while he was incarcerated.  Moss was released on May 14, and the events at issue in this case, which will be described in detail below, occurred later that evening into the early morning of May 15.[4]

As a result of the [Incident], Moss was arrested and charged with first degree sexual assault, first degree false imprisonment, and violation of a domestic violence protection order.  At the time Moss was arrested, police seized a black cell phone[5] from his pants' pocket.  At a pretrial hearing on a discovery motion held on January 4, 2016, Moss clarified that, in addition to other evidence, he was seeking any cell phones in the

---

[3] The Court states the facts under the "Pre-trial" heading as they were recited by the Nebraska Court of Appeals on direct appeal.  Filing No. 10-3. *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

[4] This Court shall refer to the events occurring the night of May 14 and the early hours of May 15 collectively as the "Incident" for ease of reference.

[5] The cell phone referenced here shall be referred to as the "Phone" throughout this Memorandum and Order.

3

possession of the police.  The district court explained that the State could give him a listing of the property in its possession or he could file a specific motion seeking to have the Phone examined by an independent expert, but the State "can't simply turn over the [P]hone to you."

Numerous additional hearings were held regarding the Phone.  The State continued to utilize its available resources to bypass the personal identification number ("PIN") code requirement on the Phone to access any information that may be stored on the Phone which would be relevant to this case.  Moss indicated a general belief that the Phone might contain exculpatory evidence and wanted updates from the State as to the status of its inspection. At various hearings, the district court reminded Moss that he could file a motion to have an independent expert examine the Phone, and the State had no objection to his doing so.  Ultimately, he never filed such motion.

The State was unable to successfully bypass the PIN code requirement on the Phone and approved utilization of a "chip off" procedure, which was described as a last option to gain access to the information stored on a cell phone.  Through this procedure, the memory chip is removed from the motherboard of a cell phone and placed in a reader to access the data directly from the chip.  Utilizing this procedure almost certainly results in the destruction of the phone.  At that point, however, that particular procedure is the only remaining option to attempt to read the chip, which is the part of the phone that contains any data or information that may be useful.

The State utilized the chip off procedure for Moss' [P]hone, but because the type of phone Moss had is rare in this part of the country, no local law enforcement agencies had a reader that could read its chip.  Thus, the chip was shipped to an out of state facility,

4

which was also unable to read the data from the chip.  The State therefore determined that it would not be able to utilize any information from the [P]hone at trial, and the Phone was returned to Moss in several pieces.

Moss filed a motion to dismiss the charges on June 6, 2016. He noted that when the [P]hone was returned to him, it was broken into pieces and he claimed that when the State determined it was unable to access the information on the [P]hone, it intentionally destroyed the [P]hone to prevent Moss from accessing it.  He asserted that as a result, his due process rights had been violated and requested that the court dismiss the charges.

An evidentiary hearing was held on the motion to dismiss, and two forensic technology experts testified for the State as to the process they used on Moss' [P]hone. They explained that because they did not have the PIN code to the [P]hone, they had to attempt to bypass the code requirement, but were unable to do so using their available technology.  Thus, as a last effort, they utilized the chip off procedure, a procedure which they have used in the past and which is an accepted procedure in the scientific community.  They acknowledged that using this procedure generally destroys the phone.

The district court subsequently issued an order concluding that the State had not acted in bad faith in failing to preserve the [P]hone.  It observed that law enforcement utilized all available means in order to gain access to the [P]hone prior to utilizing the chip off procedure.  The court noted that Moss, through counsel, could have provided the PIN code to the [P]hone which would have allowed the State to examine its contents and discover any information of evidentiary value, inculpatory or exculpatory.  The court also determined that although Moss' counsel made general statements about the [P]hone

5

possibly containing exculpatory evidence, there was never an indication as to what that evidence was or its value to Moss. Accordingly, the motion to dismiss was denied.

## B. Trial, Conviction, and Sentence

Moss' trial was held over the course of four days in January 2017 in the Sarpy County District Court. Filing Nos. 10-15, 10-16, 10-17, 10-18, and 10-19.

### 1. Trial Testimony[6]

K.E. testified that Moss was her former boyfriend and that during their relationship, they bought a pet dog. She explained that she obtained a protection order against Moss, which was issued on May 3, 2015, but when he was released from jail on May 14, he called her repeatedly. She told him not to call her anymore and that their relationship was over.

Around 7 pm that evening, K.E. went to the home she had previously shared with Moss. She observed that a glass door was broken and their dog was missing. She called 911, and while she was waiting for the police to arrive, Moss called. K.E. asked about the dog, and he said it was fine but threatened that if she wanted to see the dog again, she had to meet with him that night. K.E. decided to meet with Moss in order to get her dog back. She ultimately met him in a grocery store parking lot and got into his vehicle.

They drove around and made several stops, including at a few bars and at an extended stay hotel where Moss had been residing since his release from incarceration. K.E. testified that throughout the evening, Moss was making threats against the dog and K.E.'s family. Eventually they went to the apartment of Moss' friend, Chris Pham. The

---

[6] The Court states the following facts under the "Trial Testimony" heading as they were recited by the Nebraska Court of Appeals on direct appeal. Filing No. 10-3. *See Bucklew*, 436 F.3d at 1013.

dog was at the apartment, and K.E. was relieved to see her dog. After leaving the apartment, they drove around for a while and then returned to the hotel for the second time. At that point, K.E. was feeling distraught, confused, and a little hopeless because she thought once she got to see the dog, the night would be over.

Moss and K.E. went into Moss' hotel room, and K.E. asked if she could leave. She moved toward the door, but Moss got in front of her. He locked the door, pulled her back by the arm, and said she was staying there and not going anywhere. K.E. explained that prior to this point in the evening, she felt as though she could handle the situation, but at the point when Moss prevented her from leaving the hotel room, she no longer felt in control and began to believe that there was "no coming back."

When Moss went to use the restroom, K.E. dialed 911 from the hotel phone and left the phone off the receiver. She was unsure whether the call was successfully completed but did not have time to check before Moss exited the restroom. But she hoped that someone would hear them through the phone and send someone to the room to check on her. A hotel employee confirmed that a 911 call had been placed from Moss' room that evening. Moss had left the door to the restroom partially open, and K.E. would have had to walk past the restroom in order to get to the door of the room. K.E. explained that she was scared for herself at that point because Moss would not let her leave and had "strong-armed" her. Moss had his [P]hone and her cell phone on his person.

A short while later, Moss asked K.E. why they could not "just make love for one last time." She told him she did not want to, but he forcibly pulled her jeans off and penetrated her vagina with his penis. She continued to resist, but he put his hands around

7

her throat and over her mouth.  He pulled out of her and penetrated her again, at which point she was crying "a lot" and he stopped.

Afterwards, K.E. repeatedly pleaded with Moss to take her to get her dog or return her back to her vehicle, and he finally agreed.  He did not drive straight to her vehicle, but instead drove around for "what seemed like an eternity."  While driving Moss made comments to K.E. about how he could fix their relationship and said they would both be better off if they were dead.  Moss suggested that he wanted to end their lives by crashing the vehicle.  At that point, K.E. decided to attempt to jump out of the vehicle.  When they stopped at a red light, K.E. opened the door, started screaming for help, and jumped out.

Two nearby drivers stopped to help K.E. and called the police.  K.E. reported to the officer that Moss had held her against her will and sexually assaulted her.  The officer transported K.E. to a hospital where she underwent a sexual assault examination.

During the examination, K.E. told the nurse that she had met with her former boyfriend, and they went to a hotel.  K.E. said that Moss had indicated to her that he wanted to have sex with her one more time, she refused, but he penetrated her anyway. The sexual assault examination revealed Moss' sperm inside K.E.'s vagina.

Moss testified in his own defense at trial.  He alleged that contrary to K.E.'s testimony, she willingly accompanied him on May 14 and 15, 2015.  He denied ever threatening their dog or K.E.'s family.  He testified that while at a bar, K.E. asked him if he wanted to have sex.  He claimed that they then went to the hotel and had consensual sex.  He acknowledged arguing with her in his vehicle the following morning, but he claimed it was because she was still intoxicated.  When she opened the door to the vehicle, he said he pulled her back in because he thought she was falling out.

8

## 2. The use of shackles at Moss' trial[7]

Throughout his four-day trial, Moss was affixed with an electronic shackling device on his leg (the "Stun-Belt").[8]  No findings were made by the trial court at any time regarding the use of the Stun-Belt nor did Moss' counsel object to its use.

During the live testimony of a law enforcement witness for the State, prior to the State resting its case, the Stun-Belt activated (the "Shock Incident") for unknown reasons.[9]  Trial transcripts provide the following description of the Shock Incident and the immediate aftermath:

([Moss] yelled.)

DEPUTY:  You all right?

THE COURT:  Can you continue with your answers, sir?  Do we need to take a short break?

[MOSS]:  Can we please? Sorry, my back.

Filing No. 10-17 at 137.  The Trial Court then stopped the witness' testimony, instructed the jury that court would recess for five to ten minutes, and excused the jury.  *Id.*

After a 30-minute recess, the trial court judge brought counsel for the parties and a courtroom deputy back without the jury.  The trial court described the Shock Incident for the record as follows:

---

[7] The Court notes that the nature of the claims alleged necessitates inclusion of greater factual detail regarding the Stun-Belt and its activation than is set forth in the Nebraska Court of Appeals decision on direct appeal.  As such, the facts as recited here are provided via citation to the record before this Court.

[8] The state courts refer to the stun-style shackle used in Moss' case as the "bandit" in its discussions.  *See, e.g.*, Filing No. 10-12 at 223.  For ease of reference throughout this Memorandum and Order, this Court shall refer to the stun-style shackle Moss was required to wear throughout his trial as the "Stun-Belt" but shall not change the state courts' description of the Stun-Belt as the "bandit" when directly quoting the state courts.

[9] *Id.* at 211 (the trial court found that the circumstances surrounding the Stun-Belt's activation "remain unclear" even after the trial's conclusion).

9

THE COURT:  What occurred before the last break was there was a noise. [Moss] had a yell or kind of a brief scream realizing that the bandit had went off.  And I believe when I looked at counsel, [Moss] he said my back hurts. And at that point in time the [Court] tried to redirect everything back to the witness.  And looking at [Moss' counsel] I then turned and asked if we needed to take a break, which was appropriate.  That occurred about a little over a half hour ago.  What the Court decided to do is to have [Moss] go back and check with the deputies to make sure the bandit was working properly.

And, deputy, you stated you did not hit the trigger button.

THE DEPUTY:  I did not sir, no.

THE COURT:  All right. We ended up taking a longer break because – to have Mr. Moss, didn't want to bring him right back in or anything else like that.  We've taken a little bit of a break at that point in time and are reconvening now. I believe the bandit apparatus device has been switched.

Does that comport to what would transcribe on the record what we had recorded?

. . . .

[MOSS' COUNSEL]:  Yeah.  Your Honor, I just want to say, just so you'll know what I'm going to ask, is we proceed with the rest of the trial with the witnesses from today.  But [Moss] is in no psychological ability to continue with his testimony today.  So I'm asking that we get to the point where there's nobody left except [Moss].  I'm going to ask for us to come back tomorrow.  He's emotionally a basket case right now.

. . . .

THE COURT:  Here's what I would suggest we do: We'll finish the testimony.  We'll have to excuse the jury.  I anticipated a half-time motion from you, motion to dismiss, which we have to take place outside the record. We'll hear that, and then decide where we go at that point in time.

10

[MOSS' COUNSEL]:  Because I do have, you know, a couple witnesses outside and if the motion to dismiss is not granted then.

THE COURT:  Then you can proceed with those witnesses.  We would anticipate maybe the jury getting out a little early today, that would be fine.

[MOSS' COUNSEL]:  That's fine.

THE COURT:  . . . . All right.  I'm going to have the parties remain seated while the jury comes back in for obvious reasons.

(Jury entered courtroom.)

THE COURT:  Please have a seat.  All right.  Back on the record here on CR15 page 660.  Want to thank the jury.  We had to take a break.  We had a couple of other motions we had to address.  And I believe at this time we're ready to start . . . .

*Id.* at 138-40.

### 3.  Conviction and sentence

Moss was found guilty of one count of First Degree Sexual Assault, one count of First Degree False Imprisonment, and one count of Violation of a Domestic Violence Protection Order pursuant to a verdict of the jury on January 17, 2017.  Filing No. 10-12 at 179.  Moss was sentenced to serve not less than 26 years nor more than 31 years on July 10, 2017.  *Id.* at 218-19.

## C.  Post-Trial Motions

### 1.  Motion for New Trial

With court approval, Moss filed an amended motion for new trial on February 20, 2017, seeking a new trial under various Nebraska state statutes due to: (1) Moss having been prejudiced and denied a fair and impartial trial due to his receiving a 50,000 volt

11

shock from the Stun-Belt in the presence of the jury, arguing Moss did not cause the shock, that the use of the Stun-Belt should have been precluded due to his medical conditions, and the use of the Stun-Belt "violated rules and policies governing" its use; (2) the verdict being based on insufficient evidence; (3) the trial court preventing evidence of the victim and her "friend" recanting her testimony and providing a motive for her allegations against Moss; (4) the trial court's failure to allow evidence in the form of cell phone records containing communications between Moss and the victim; (5) the State's destruction of the [P]hone containing exculpatory evidence; and (6) speedy trial violations relating to the calculation of time made by the trial court. Filing No. 10-12 at 193-94.

The motion for new trial was heard on May 16, 2017, and the court rendered its decision on June 12, 2017, overruling the motion. *Id.* at 209-212.

In its opinion, the trial court made the following findings regarding the Stun-Belt:

> During the trial, [Moss] was equipped with an electronic restraint band ("bandit"). On January 12, 2017, [Moss] received an electric shock from the bandit. A recess was taken. [Moss] did not move for a mistrial. Instead, Defendant elected to take a recess and then continue with trial. At the close of the State's case, [Moss] made a motion to dismiss on the grounds of 'cruel and unusual punishment'. This motion was denied and the matter proceeded to [Moss'] case-in-chief. Closing arguments were held, the jury was instructed, and the case was submitted for deliberation. The jury returned a guilty verdict on all counts.

*Id.* at 209.

### b. Motion for Jury Affidavits

On February 22, 2017, Moss filed a motion to obtain jury affidavits. *Id.* at 197. Following a hearing on February 27, 2017, the trial court granted the motion for jury affidavits and ordered the clerk to provide jury contact information to defense counsel. *Id.* at 200-01.

At a hearing on May 16, 2017, Moss' counsel argued that he had obtained verbal statements from at least two jurors indicating they believed Moss had been "tased" during the Shock Incident and that he was "in custody." Filing No. 10-19 at 102. However, he contended that these jurors later refused to provide written statements or to otherwise respond to such requests after they were contacted by the State. *Id.* at 103. He further argued that the State had sent out affidavits to about five jurors before Moss was given juror contact information, appearing to allege the State had tampered with or otherwise inappropriately attempted to influence them. *Id.* The court took the matter under advisement but declined to address the issue further when issuing its decision on the motion for new trial.

### D.  Direct Appeal

On direct appeal Moss, represented by new counsel, appealed his convictions and sentences to the Nebraska Court of Appeals. Filing No. 10-1. Moss argued that he received ineffective assistance of counsel and that the trial court erred in (1) failing to grant his motion for discharge for denial of his statutory and constitutional rights to a speedy trial, (2) failing to grant his motion to dismiss for the spoliation and destruction of the [P]hone, (3) failing to grant a mistrial, admonish the jury, or otherwise rectify the prejudice resulting from being shocked by the Stun-Belt, (4) failing to grant a directed verdict due to insufficient evidence, (5) failing to grant him a term of probation, and (6) imposing an excessive sentence. Filing No. 10-5 (the "Direct Appeal"). The Nebraska Court of Appeals found that the record on direct appeal was insufficient to address his ineffective assistance of counsel claims relating to the Stun-Belt, cell phone records, and a failure to disclose potential witness Aurterburn. Filing No. 10-3 at 14-15. The court

13

rejected the remaining claims of trial court error in the Direct Appeal and affirmed Moss'

convictions and sentences. *See Id.*

Moss petitioned to the Nebraska Supreme Court for further review, raising the

same arguments as in his Direct Appeal. Filing No. 10-7 at 1, 4-13. The Nebraska

Supreme Court summarily denied Moss' request for further review on August 7, 2018.

Filing No. 10-1 at 4.

### E. Postconviction Motion

On August 22, 2019, Moss filed a timely pro se motion for postconviction relief (the

"PCM"), claiming that trial counsel was ineffective for (1) failing to request a hearing or

otherwise object to Moss' wearing the Stun-Belt during trial, (2) failing to request an

instruction or admonishment to the jury regarding the use of the Stun-Belt at trial, (3)

failing to move for a mistrial due to the use of the Stun-Belt in the jury's presence, (4)

failing to offer Jennifer York's testimony regarding the destruction of the [P]hone, (5)

failing to provide a meaningful defense, (6) failing to admit Moss' cell phone records which

established the victim had contacted him after the charges were filed, contradicting the

victim's testimony, (7) failing to properly document the exculpatory nature of the cell

phone calls being sought from Moss' [P]hone, (8) failing to disclose witnesses Aurterburn

and Pollard in discovery precluding their testimony at his trial, (9) failing to serve out of

state witness Pollard to compel his testimony at Moss' trial, (10) failing to make an offer

of proof regarding the testimony of Aurterburn and Pollard, (11) failing to call Jennifer

Hessig ("Hessig") as a witness regarding her attempts to obtain Moss' [P]hone PIN

number, and (12) failing to withdraw as counsel and testify regarding the lack of request

for Moss' [P]hone PIN by the prosecution. Filing No. 10-13 at 3-21. He also claimed that

14

the cumulative effect of these alleged errors denied him effective assistance of counsel. *Id.* at 21. Moss requested an evidentiary hearing, the ability to take the deposition of his counsel, Alan Martin, and others unnamed, and "such other evidence as allowed and provided by law" and any other relief the court deems required "by justice and equity." *Id.*

In a written order filed August 31, 2017, the state district court rejected each of Moss' claims and denied his request for an evidentiary hearing. *Id.* at 24-32. The court also denied his request for appointment of counsel as moot. *Id.* at 32.

Moss appealed the decision of the district court denying his PCM, which was denied by the Nebraska Court of Appeals on July 28, 2020. Filing No. 10-4. Following the decision, Moss, pro se, filed a petition for further review on August 25, 2020 (the "PCM PFR"), Filing No. 10-11, which was summarily denied, *see* Filing No. 10-2 at 4.

## F. Habeas Petition

Moss filed his Petition for Writ of Habeas Corpus in this court on November 12, 2020. Filing No. 1. In response to the Petition, Respondent filed an Answer, Filing No. 13, a brief in support, Filing No. 14, and state court records, Filing No. 10 and Filing No. 54. Moss filed a brief, Filing No. 18, and a motion for second reply brief, Filing No. 19, which was denied by this Court, Filing No. 20.

## III. OVERVIEW OF APPLICABLE LAW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." In other words, this Court's review of habeas claims is limited to federal constitutional questions. Moreover, habeas

relief is available only when a claim *adjudicated on the merits in state court* resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Nicklasson v. Roper*, 491 F.3d 830, 833 (8th Cir. 2007) (emphasis added) (citing 28 U.S.C. § 2254(d)).

Conversely, federal review of a habeas petition is barred when a federal habeas petitioner failed to exhaust his claims by giving them a full round of review in the state courts or if the state court dismisses or rejects a prisoner's claims on independent and adequate state grounds unless a petitioner can demonstrate either (1) cause and prejudice or (2) actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## IV. DISCUSSION

### A.  Claim One

At the center of Moss' first claim is the use of the Stun-Belt as a means of physical restraint that Moss was required to wear throughout his trial.  Prior to Moss presenting his defense, the Stun-Belt delivered a shock to Moss in the jury's presence while Moss was seated next to his counsel during a government witness' testimony.  Filing No. 1 at 5; Filing No. 10-17 at 136-38.  Following the Shock Incident, the Court required Moss to be reaffixed with a Stun-Belt[10] and continue wearing it for the remainder of his trial (including during Moss' own testimony).  It is both the Shock Incident and the use of the Stun-Belt generally that form the basis for Moss' claims in Claim One.

---

[10] Although Moss submits he was required to wear the same Stun-Belt which shocked him, *see* Filing No. 1 at 25, it is unclear from the record whether the Stun-Belt utilized after the Shock Incident was the same one that delivered the shock or if a new Stun-Belt was affixed.  Ultimately it is unnecessary for this Court to resolve this issue to render a decision here.

In the Court's summary of claims, Claim One was separated into five subparts, with Subparts One and Three addressing alleged trial court error, Subparts Two and Four addressing alleged trial counsel error, and Subpart Five addressing alleged error of direct appellate counsel. Filing No. 6 at 1. Respondent declined to address the merits of any of the Ground One Subparts, arguing instead that all of Claim One is procedurally defaulted. *See* Filing No. 14 at 16-21. As Respondent did not elaborate, the Court construes Respondent's position as arguing that Subparts Two and Four are procedurally defaulted because the state appellate court denied these claims based on an independent and adequate procedural state ground,[11] and the substance of Subparts One, Three, and Five were never fairly presented to the state courts (and can no longer be presented under Nebraska law), rendering them exhausted via anticipatory procedural default. *See* Filing No. 14 at 16, 21.

### 1. Procedural Default and Exhaustion

Before a federal court can consider the merits of a habeas claim, a federal habeas petitioner must comply with the exhaustion requirement of section 2254(b).[12] Where a state prisoner fails to take advantage of an available opportunity to litigate a claim in state court, the problem is a failure to exhaust. *See, e.g.*, *Wainwright v. Sykes*, 433 U.S. 72 (1977). The United States Supreme Court has explained the habeas exhaustion requirement as follows:

---

[11] Subparts Two and Four were first presented to the state courts in Moss' Direct Appeal but the court declined to address either claim citing that the record was insufficient to address the claims. Filing No. 10-13 at 13-14. Moss then included them in his PCM, which was ultimately denied without the granting of an evidentiary hearing on a state procedural ground. Filing No. 14 at 16-20.

[12] A federal writ of habeas corpus from an inmate in state custody shall not be granted unless: 1) the inmate has exhausted his legal remedies in the state courts; 2) state corrective processes are absent; or 3) circumstances render such processes insufficient to protect the individual's rights. 28 U.S.C. § 2254(b)(1).

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts ... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The exhaustion requirement is satisfied when "the federal claim has been *fairly presented* to the state courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (emphasis added). The United States Supreme Court described the connection between fair presentment and exhaustion as follows:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court ... thereby alerting that court to the federal nature of the claim.

*Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). In a nutshell, only when the state courts have been given a full opportunity to address the substance of a claim set forth in a federal habeas petition (via a petitioner's invoking one complete round of the state's established appellate review process) is the exhaustion requirement fulfilled in a way that allows a federal habeas court to consider the claim's merits. *Boerckel* 526 U.S. at 842–45; *see also Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999) (citation omitted).

To apply the independent and adequate procedural default doctrine, the state court must explicitly rely on a state procedural rule to deny the petitioner relief. *See Ylst v. Nunnemaker,* 501 U.S. 797 (1991); *Harris v. Reed,* 489 U.S. 255, 259 (1989). Then, if "the state appellate court declined to address [the claim or claims at issue] because the

18

petitioner failed to meet a state procedural requirement constituting an 'independent and adequate state ground,'" federal habeas courts may not consider the claim even if otherwise reviewable. *Crawford v. Minnesota*, 498 F.3d 851, 854 (8th Cir. 2007) (quoting *Coleman*, 501 U.S. at 730).

With these concepts in mind, this Court must first determine whether any of Subparts One, Three, and Five were exhausted by fair presentation to the state courts and are, thus, reviewable by this Court on their merits, or if they are anticipatorily procedurally defaulted and outside the scope of review. As to Subparts Two and Four (which were fairly presented to the Nebraska state courts but were denied review and an evidentiary hearing based on a state procedural rule), *see* Filing No. 14 at 16-20, the Court must determine if they are procedurally defaulted and beyond the scope of review here via application of the independent and adequate state law doctrine. Only if a Subpart is not procedurally defaulted[13] shall this Court move onto a review of a Subpart's merits.

### a. Fair presentment – Subparts One, Three, and Five

A claim brought in a federal habeas proceeding need not be "an exact duplicate of the one raised in the state court proceeding" to be fairly presented. *Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) (internal quotation omitted). Fair presentment in conjunction with the exhaustion doctrine has been described as requiring presenting the state court system "with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006) (citing *Picard*, 404

---

[13] While a procedural default may be excused, *see, e.g.*, *Torres v. Jeffreys*, No. 4:17CV3078, 2025 WL 579130, at *1 (D. Neb. Feb. 21, 2025), *aff'd*, No. 4:17CV3078, 2025 WL 1042557 (D. Neb. Apr. 8, 2025) (citing *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Shinn v. Ramirez*, 596 U.S. 366 (2022); *Williams*, 529 U.S. 420)), Moss makes no such argument. Therefore, this Court shall not address the excuse of procedural default doctrine further.

19

U.S. at 275-77).  And a state court must be "sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis."  *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013) (quoting *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)).

> To sufficiently alert does not require extensive elaboration:
>
> A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal."

*Reese*, 541 U.S. at 32.

And, while a federal claim must not contain "significant additional facts[,] . . . closely related claims containing an arguable factual commonality may be reviewed."  *Ward*, 577 F.3d at 935 (quoting *Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997) (internal quotations omitted); *see also Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir.1999) (explaining that to be fairly presented, the claims and arguments in a federal habeas need not be identical, but a petitioner must give state courts a meaningful opportunity to pass upon the substance of the claims later pressed in federal court). To summarize, fair presentment requires a petitioner to "present the same legal and factual bases to the federal courts that were presented to the state courts."  *Ward*, 577 F.3d at 935 (citing *Anderson*, 106 F.3d at 245).

Importantly, it is the briefs of a federal petitioner to the state courts that sets the stage for whether a claim has been fairly presented, not the state court's interpretation of the claim (or the failure of the state courts to address it).  *Dye v. Hofbauer*, 546 U.S. 1, 4

20

(2005).    Therefore, this Court must review Moss' state court briefings to determine if Subparts One, Three, and/or Five were exhausted via fair presentment.

### i.  *Subpart Five – Ineffective assistance of appellate counsel*

Moss raises a claim of ineffective assistance of direct appellate counsel in his Petition but does not expound upon the claim, requesting this Court consider errors relating to "[a]ny and all issues brought up in any . . . post conviction [motion]."  Filing No. 1 at 5, 62.    Upon review of Moss' PCM briefing,[14] there is no reference to ineffective assistance of appellate counsel.  *See* Filing No. 10-8 (no mention of any direct appellate counsel errors); Filing No. 10-10 (same).  As Moss could have raised such a claim in his PCM but failed to do so, he never presented his Subpart Five claim to the state courts, and, as the time to bring such a claim has passed,[15] it is procedurally defaulted and beyond the scope of this Court's review.

### ii.  *Subparts One and Three – Trial court error*

Subparts One and Three both address claims of trial court error relating to the use of the Stun-Belt and the Shock Incident, but, unlike Subpart Five, Moss did allege trial

---

[14] In Nebraska, when raising claims that direct appellate counsel (who in Moss' case was different from his trial counsel) was constitutionally ineffective, such claims are appropriately brought in the first postconviction motion filed.  *United States v. Davis*, 406 F.3d 505, 510 (8th Cir. 2005).

[15] Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion."  *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003).  A person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal.  *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.").  Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief.  Otherwise, the claim is defaulted under Nebraska law.  *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).  As Moss filed a postconviction motion and could have, but did not, allege any claims of ineffective assistance of appellate counsel, *see* Filing No. 10-8; Filing No. 10-10, he is precluded from doing so now under Nebraska law.

court error relating to the Stun-Belt and the Shock Incident in his Direct Appeal. *See* Filing No. 10-5 at 26-28, 36-41. To the extent Respondent's position is that Subparts One and Three are not the same claims as those Moss raised in his Direct Appeal and therefore were not "fairly presented" to the state courts and are now procedurally defaulted, this Court disagrees with Respondent in part.

In his Direct Appeal, Moss clearly raised state law claims of trial court error for failing to declare a mistrial or issue curative instructions following the Shock Incident under state law.[16] However, a review of Moss' Direct Appeal establishes that state law claims of trial court error were not the only trial court error claims Moss asserted, although they were the only ones the Nebraska courts addressed.

It is without question that Moss' direct appellate brief was not well crafted. The claims and factual assertions addressing trial court error and ineffective assistance of trial counsel relating to the Stun-Belt/Shock Incident are scattered throughout his Direct Appeal briefing, often in long rambling passages littered with seemingly unrelated or unnecessary information, supposition, conclusory statements, and somewhat haphazard citation to state and federal case law. *See* Filing No. 10-5. Fortunately for Moss, the lack of succinct presentation is not necessarily fatal to obtaining review by this Court. *See, e.g.*, *Al'Faro v. Cullen*, No. C 08-4295 SI PR, 2010 WL 4690873, at *2 (N.D. Cal. Nov. 10, 2010) ("the exhaustion analysis focuses less on the quality of the presentation and more on whether the information is present somewhere in the [state court] brief.").

---

[16] Moss does not appear to raise the same state law claims in his Petition as he did in his Direct Appeal. And, even had he done so, those claims are outside of the scope of this Court's review as a federal habeas court has no authority to review a state court's interpretation or application of its own state laws. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions).

22

When reading all portions of Moss' Direct Appeal briefing addressing the use of the Stun-Belt and effect of the Shock Incident together, it is surprisingly easy to determine that the following four overarching issues, arguments, and facts in support discussed there are largely the same as his claims/supporting arguments in Subparts One and Three (also overlapping into Subparts Two and Four). The issues raised are: (1) the trial court should have, but did not, make any findings regarding the use of the Stun-Belt at any time during Moss' trial including after the Shock Incident, (2) Moss' trial counsel should have, but did not, object to the use of the Stun-Belt at any time during Moss' trial including after the Shock Incident, (3) Moss was prejudiced by the use of the Stun-Belt and the Shock Incident, and (4) neither the trial court nor Moss' trial counsel did anything to alleviate or address the prejudice Moss suffered from the use of the Stun-Belt and the Shock Incident. And, he contends, these failures and the resulting prejudice affected the outcome of his trial in violation of his rights under the United States Constitution. *Compare* Filing No. 10-5 at 26-28, 36-41, *with* Filing No. 1 at 29-33; Filing No. 18 at 7-11.

Fair presentation of a claim in habeas, however, requires more than presenting similar facts which could support a constitutional violation—a petitioner must also have presented similar *legal* arguments to the state courts. And, "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Reese,* 541 U.S. at 32. Instead, the fair presentation requirement is met if a petitioner refers to a specific federal constitutional right, a particular constitutional provision, or a federal or state case addressing the constitutional issue. *McCall v. Benson*, 114 F.3d 754, 757 (8th

23

Cir. 1997); *White v. Dingle*, 267 F. App'x 489, 492 (8th Cir. 2008) ("We have repeatedly held that a federal habeas petitioner does not fairly present a federal issue to the state courts unless he refers to a specific federal right or federal constitutional provision, or cites pertinent case law discussing the federal issue in question.").

In Moss' case, he raises many of the same legal arguments in his Petition that he made in his Direct Appeal, in large part by citing to the Eleventh Circuit case of *United States v. Durham*, 287 F.3d 1297, 1307 (11th Cir. 2002) in both.[17]  *See* Filing No. 10-5 at 37-39 (citing to *Durham* and arguing that "the decision to use electronic restraints must be made by trial courts," and the use of the Stun-Belt throughout his trial without any findings regarding its use by the trial court (and without any objection to its use by his counsel) violated his constitutional right to a fair trial); Filing No. 1 at 22, 25 (citing *Durham*, 287 F.3d at 1305-06).  In *Durham*, the Eleventh Circuit was asked to determine whether a trial court abused its discretion in requiring a criminal defendant to wear a stun-style shackle throughout the guilt phase of his trial.  *Durham*, 287 F.3d at 1303.  In rendering its decision, the *Durham* court first found that it was the sole discretion of the trial court to determine whether a criminal defendant may be shackled at trial and then turned to "principles developed in earlier cases" concerning the use of physical shackles on a defendant at trial in finding that the trial court had abused its discretion in allowing the use of a stun-style shackle without making any findings to support its use.  *Id.* at 1304. Ultimately, the *Durham* Court held that the use of a stun-style shackle may be necessary in certain circumstances, but the constitution requires a presiding court to first subject the

---

[17] Of note, in addition to the arguments raised in the Petition and supporting briefing, Moss incorporates facts and legal argument from his appellate briefs into his Petition.  *See* Filing No. 1 at 33.

decision to "careful scrutiny," including a determination of the method in which the stun-style shackle is to operate, an examination of alternative means of restraint, and a finding in the record that the stun-style shackle is necessary under the circumstances. *Durham*, 287 F.3d at 1309.

The "substantial body of case law addressing how other sorts of security measures affect a defendant's trial rights" considered by the *Durham* Court addressed long recognized constitutional principles at issue both when traditional shackles and stun-style shackles are used. *Id.* at 1303. The court discussed the various ways the use of stun style shackles could affect a defendant's right to a fair trial by looking at the constitutional principles considered in traditional shackling cases, discussing their effect on the defendant's presumption of innocence; *id.* at 1304 (citing *Estelle v. Williams*, 425 U.S. 501, 503, (1976); *Illinois v. Allen*, 397 U.S. 337, 344 (1970); their impact on a defendant's Sixth Amendment right to confer with counsel and participate in his own defense, *id.* (citing *United States v. Brantley*, 68 F.3d 1283, 1290–91 (11th Cir. 1995) (citing *United States v. Gagnon*, 470 U.S. 522, 526 (1985))); and the detriment to the dignified administration of criminal justice, *id.* (citing *Allen*, 397 U.S. at 344). The *Durham* Court concluded that the prejudice caused by the unjustified use of a stun-style shackle at Durham's trial had significantly violated those principles and said error was not harmless. *Id.* at 1309.

Moss, in addressing the use of the Stun-Belt, argued both on Direct Appeal and in his Petition the same principles addressed in *Durham*—that no findings were made by the trial court regarding the use of the Stun-Belt and that he was prejudiced by the trial court's (and his counsel's) lack of action following the Shock Incident. *See* Filing No. 1 at

25

29-33; Filing No. 18 at 7-11; Filing No. 10-5 at 4, 37-38.  While it is clear to this Court that the trial court error claims are largely the same, Moss' citation to *Durham* in both instances is particularly illustrative of those similarities and should have notified the state courts of the constitutional nature of these claims.  In other words, Moss' application of constitutional principles to his claim of trial court error in his Direct Appeal and in his Petition are the same: constitutional violations regarding the unauthorized and improper application of the Stun-Belt to his person by the trial court, the failure of the trial court to justify its use at any time, and the resulting prejudice Moss suffered from the Stun-Belt's use improperly influenced the outcome of his trial denying him a fair trial.

For these reasons, to the extent Moss raises claims of trial court error in Subparts One and Three for failing to make any findings prior to the use of the Stun-Belt, the prejudicial effect relating to the use of the Stun-Belt and the resulting Shock Incident, for failing to protect the trial's integrity by not mitigating the damage to Moss' constitutionally protected rights following the Shock Incident, and failing to make any findings regarding the continued use of the Stun-Belt, those claims were fairly presented to the state courts.[18]  The same cannot be said, however, for the remainder of Moss' Subpart One and Three arguments.

---

[18] For Moss' claims to be fairly presented they must have been presented to each level of state court review. Here, following the denial of claims in his Direct Appeal, Moss petitioned for further review by the Nebraska Supreme Court.  Filing No. 10-7.  Moss' brief to the Nebraska Supreme Court was very short, incorporating the section of his Direct Appeal addressing the Stun-Belt claims by reference due to briefing page limits. Filing No. 10-7 at 9.  While the Nebraska Supreme Court has opined that incorporation of arguments from an appellant's brief into a petition for review to the Supreme Court is potentially perilous, it is also not expressly forbidden.  *Malone v. Davis*, No. A-23-894, 2024 WL 4211935, at *5 (Neb. Ct. App. Sept. 17, 2024) ("the Supreme Court does not encourage incorporating by reference any content material to a party's argument...") (citing *State v. Garcia*, 994 N.W.2d 610 (Neb. 2023); *County of Lancaster v. County of Custer*, 985 N.W.2d 612 (Neb. 2023)).  Therefore, as ultimately the Nebraska Supreme Court denied Moss' request for further review on August 7, 2018, *see* Filing No. 10-1 at 4, these issues were fairly presented to, but not addressed by, the Nebraska Supreme Court, rendering the Nebraska Court of Appeals decision the last reasoned opinion addressing these claims.

Specifically, Moss also argues in Subpart One that the state courts erred by requiring him to establish prejudice to support his trial court error claims because the Supreme Court held in *Deck* that, where a defendant is made to wear shackles visible to the jury without adequate justification, it becomes the government's burden to establish that no prejudice resulted from the use of the shackles—not a petitioner's burden to establish prejudice. Filing No. 1 at 25-28, 30-32 (citing *Deck v. Missouri*, 544 U.S. 622 (2005)). He also reconfigures that same argument into one of plain error, arguing in Subpart Three that the state courts erred when requiring Moss to establish prejudice resulting from the trial court's failure to declare a mistrial in violation of *Deck*. *Id.*

While *Deck* will be discussed at length later in this Memorandum and Order, for the purposes of proceeding here, it is enough to understand that the *Deck* Court found that prejudice is presumed where a trial court utilizes visible shackling without making findings of fact on the record. *See Deck*, 544 U.S. at 635. Moss, however, referenced *Durham* not *Deck* in his Direct Appeal. And, as *Durham* preceded *Deck* by several years, no reference to the specific holding in *Deck* could be inferred from the reference to *Durham* regarding presumed prejudice. Therefore, as Moss did not argue or otherwise cite to any case addressing the holding in *Deck* regarding a *presumption of prejudice* in his briefings to the state courts, that portion of Moss' current argument was not fairly presented to the state courts regardless of whether the Stun-Belt's use was, or became, known to the jury after the Shock Incident, and is therefore procedurally defaulted and outside the scope of this Court's review.

27

### iii.  Independent and adequate – Subparts Two and Four

In Subparts Two and Four, Moss claims his trial counsel was ineffective for failing to object to his wearing of the Stun-Belt at trial both before and after the Shock-Incident, and for failing to move for a mistrial or a jury admonishment after the Shock-Incident. Filing No. 1 at 5.  Respondent does not contest that Moss' claims both in his Direct Appeal and his PCM are similar to the claims Moss now raises in Subparts Two and Four.  Filing No. 14 at 16.  The basis for Respondent's position is a simple one: he contends that Moss' claims were denied in his PCM pursuant to Nebraska's Postconviction Act (the "PCA") without the granting of an evidentiary hearing, automatically rendering the denial as based on a state procedural rule as opposed to a decision on the merits.  *Id.* at 16-21 (citing Filing No. 10-4 at 4-5).  Respondent appears to conclude that such a denial implicates the independent and adequate procedural law doctrine, automatically resulting in the procedural default of both Subparts, and precluding review by this Court.  *Id.* at 21.

Moss' ineffective assistance of counsel claims in Subparts Two and Four first came before the state courts in his Direct Appeal.  *See* Filing No. 10-5 at 36-40.  After the state appellate court declined to rule on them, Filing No. 10-3 at 13–14, they were again raised in Moss' PCM brought pursuant to the PCA, Filing No. 10-8 at 5, 17–38, and were ultimately denied without an evidentiary hearing under the PCA for failure to properly allege prejudice, Filing No. 10-4 at 3-5.(citing *State v. Dubray*, 885 N.W.2d 540 (Neb. 2016)).

Section 29-3001 of the PCA provides in relevant part:

(1) A prisoner in custody under sentence and claiming a right to be released on the ground that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States, may file a

28

verified motion, in the court which imposed such sentence, stating the grounds relied upon and asking the court to vacate or set aside the sentence.

(2) Unless the motion and the files and records of the case show to the satisfaction of the court that the prisoner is entitled to no relief, the court shall cause notice thereof to be served on the county attorney, grant a prompt hearing thereon, and determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States, the court shall vacate and set aside the judgment and shall discharge the prisoner or resentence the prisoner or grant a new trial as may appear appropriate. . . .

Neb. Rev. Stat. § 29-3001.

While it appears to this Court that the allegations Moss asserted in his PCM adequately plead prejudice in relation to Subparts Two and Four, unfortunately for Moss, the opinion of this Court is irrelevant in this instance. As discussed previously, a state ground is independent of federal law if it does not depend on the merits of a petitioner's claim. And, to the extent a Nebraska court must always examine the substance of the underlying claim to determine whether it is sufficiently pleaded, the denial of an evidentiary hearing due to failure to meet Nebraska's pleading standards constitutes an adequate and independent state law ground, even when it is applied to federal claims regarding ineffective assistance of counsel. *See, e.g.*, Whyte v. Winkleski, 34 F.4th 617, 624 (7th Cir. 2022) (discussing application of Wisconsin pleading standards in relation to the independent and adequate state law doctrine).

Moreover, while an argument could be made that the denial of these Subparts in the state appellate court's ruling on the PCM constituted an alternative ruling on the merits, review is foreclosed when adequate and independent state law grounds are sufficient to resolve the dispute. Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state

29

court need not fear reaching the merits of a federal claim in an alternative holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

For these reasons, Petitioner is not entitled to relief on Subparts Two or Four as they are procedurally defaulted pursuant to the independent and adequate state law doctrine and their merits are therefore outside the scope of review of this Court.

## 2.  Standard of Review – Subparts One and Three

When a claim is exhausted, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal habeas petition based on a state court conviction "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law ... [or] resulted in a decision that was based on an unreasonable determination of the facts…".  28 U.S.C. § 2254(d)(1)-(2).  And, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA."  *Brown v. Davenport*, 596 U.S. 118, 122 (2022) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).  Under *Brecht*, the Court must assess whether the error at issue "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht,* 507 U.S. at 623 (internal quotation marks omitted).  Therefore, for a federal habeas petitioner to succeed he generally must establish both that the state courts erred

under § 2254(d) and that the error was not "harmless" under *Brecht*. *Davenport*, 596 U.S. at 112.

For the deferential standard of review in § 2254(d) to apply, however, the habeas claim must have been "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Here, because Moss exhausted the previously discussed portions of Subparts One and Three via fair presentation, but those claims were not adjudicated on the merits by any Nebraska court,[19] the AEDPA standard does not apply. *Davenport*, 596 U.S. at 137 (citing *Fry v. Pliler*, 551 U.S. 112 (2007)); *see also Reagan v. Norris*, 365 F.3d 616, 621 (8th Cir. 2004) (stating that because claim was not brought before state courts, there was no adjudication on merits and thus § 2254(d) was inapplicable). Rather, under these circumstances, such a claim is reviewed by a federal court de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (stating federal court review "is not circumscribed by a state court conclusion" when the state court did not reach the merits of a federal claim))).

As Subparts One and Three are exhausted but were not addressed on their merits, this Court now proceeds to their de novo review applying the *Brecht* standard.

---

[19] Although AEDPA deference does not apply to these claims, to the extent the state appellate court revived any portion of these claims in its decision addressing Moss' PCM, the state court misapplied federal law in finding that the crimes for which Moss was charged alone could be used as a basis to support his shackling. *See* Filing No. 10-4 at 5 (describing a jury's knowledge of a defendant's shackling as simply "call[ing] the jury's attention to what it already knew – that the defendant was charged with a serious crime."). Such is not the case. The nature of the crime for which a defendant is charged alone does not justify shackling without explanation. *See, e.g.*, *Lakin*, 431 F.3d at 965 (in discussing the *Deck* decision the Court explained that "[a] per se rule that permitted shackling those defendant's [sic] merely charged with certain crimes such as escape or murder would run afoul of the individualized determination that the due process clause requires."); *see also Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (a court may consider the nature of the crime for which a defendant was charged but only along with other factors when determining whether shackling is appropriate). Therefore, even under ADEPA the Nebraska Appellate Court's attempt at justifying Moss' otherwise unjustified shackling was erroneous.

31

### 3. Analysis – Subparts One and Three

Trial court error claims relating to the use of shackles at trial are reviewed for an abuse of discretion. *Hellum v. Warden, U.S. Penitentiary Leavenworth*, 28 F.3d 903, 907 (8th Cir. 1994) (citing *Estelle (Williams)*, 425 U.S. at 505; *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir. 1987); *United States v. Ferguson*, 758 F.2d 843, 854 (2d Cir. 1985), cert. denied, 474 U.S. 1032 (1985)). Only if an abuse of discretion is found does this Court need to consider whether the use of the Stun-Belt was prejudicial to Moss. And, if prejudice is found, the Court must then consider whether the prejudice Moss suffered was harmless or if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623.

For the reasons that follow, this Court finds that the trial court's failure to make any findings regarding the basis for Moss' shackling at anytime during his trial constituted an abuse of discretion and that the use of the Stun-Belt was prejudicial to Moss, impacting both his presumption of innocence before the jury and his Sixth Amendment rights, as well as resulting in a wholesale failure to ensure the decorum of the courtroom, *see e.g. Deck*, 544 U.S. at 635 (discussing the prejudicial effect of shackles on a jury, a defendant, and the court process), and had a "substantial and injurious effect" on the jury's verdict. As such, this Court finds that the writ should be granted as to Subparts One and Three.

#### a. Abuse of Discretion

A trial judge retains both the discretion to restrain a defendant with shackles and the responsibility to ensure the progression and safety of a trial. *Lampkins v. Thompson*, 337 F.3d 1009, 1016 (8th Cir. 2003) (citing *United States v. Darden*, 70 F.3d 1507, 1533 (8th Cir.1995)). However, a trial court cannot do so without limitation. A criminal

32

defendant is entitled to a fair trial, as guaranteed by the Sixth and Fourteenth Amendments. *Hellum*, 28 F.3d at 907 (citing *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Estelle (Williams)*, 425 U.S. at 503). The rule forbidding shackling during the guilt phase of a trial absent "the presence of a special need" is a "long held and consistently acknowledged constitutional principle."[20] *Deck*, 544 U.S. at 626. Consequently, even though a trial court has the discretion to utilize shackles, that discretion is far from unrestricted.

"Measures which single out a defendant as a particularly dangerous or guilty person," such as shackling, have been deemed, in some circumstances, prejudicial and, in others, as "'inherently prejudicial.'" *Hellum*, 28 F.3d at 907 (citing *Estelle (Williams)*, 425 U.S. at 505; *Elledge*, 823 F.2d at 1451; *Ferguson*, 758 F.2d at 854, cert. denied, 474 U.S. 1032 (1985), and quoting *Holbrook*, 475 U.S. at 568-69). However, "[w]hile it is beyond dispute that a court must be cognizant of any act that may undermine the fairness of the judicial process, it is well-settled that it may be necessary in some instances to restrain a defendant." *Amrine v. Bowersox*, No. 90-0940-CV-W-2, 1996 WL 33370754, at *22 (W.D. Mo. Feb. 26, 1996) (citing *Allen*, 397 U.S. at 344). Of note, the use of shackles is generally considered a last resort, and their use is consistent with due process only when a trial judge determines that the shackle is justified by an essential state

---

[20] The *Deck* Court acknowledged that while lower courts have "disagreed about the specific procedural steps a trial court must take prior to shackling, about the amount and type of evidence a trial court must establish to justify the use of shackles, and about what forms of prejudice might warrant a new trial, [ ] they have not questioned the basic principle" that "during the guilt phase of a trial, a criminal defendant has a right to remain free of physical restraints that are visible to the jury; that the right has a constitutional dimension; but that the right may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum." *Deck*, 544 U.S. at 629. Therefore, a trial court must consider the use of shackles in conjunction with essential state interests particular to each defendant.

interest specific to a particular trial. *Deck*, 544 U.S. at 629, 632; *see also Holbrook*, 475 U.S. at 568–69; *Allen*, 397 U.S. at 344.

The test for determining whether the use of shackles at a criminal trial[21] results in an abuse of discretion starts with determining whether their use was justified by furtherance of an "essential state interest." *Hellum*, 28 F.3d at 907 (citing *Estelle (Williams)*, 425 U.S. at 504; *Holbrook*, 475 U.S. at 568)). Generally, when reviewing a trial court's decision to use additional security measures, the question is "whether the grounds for additional security which existed at the time the security measures were taken justify any prejudice which they created." *Hellum*, 28 F.3d at 907 (citing *Gilmore v. Armontrout*, 861 F.2d 1961, 1071 (8th Cir. 1988); *Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th Cir. 1985); *Harrell v. Israel*, 672 F.2d 632, 636 (7th Cir. 1982); *Payne v. Smith*, 667 F.2d 541, 544 (6th Cir. 1981), cert. denied, 456 U.S. 932 [ ] (1982)). And, the burden of affirmatively demonstrating prejudice from "additional" security measures generally rests with the party challenging those measures. *Hellum*, 28 F.3d at 907.

"[T]he factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial" must be taken into account when determining if the use of shackles is appropriate. *Deck*, 544 U.S. at 629. The Sixth Circuit, for example, has articulated such factors to include: "(1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but

---

[21] Importantly, in the Eighth Circuit the use of stun-style shackles as an additional security measure are no different than regular shackles to the extent they also require "close judicial scrutiny, because of [their] potentially disruptive effect on the defendant's rights and the fairness of the factfinding process." *See United States v. Honken*, 541 F.3d 1146, 1164 (8th Cir. 2008) (quoting *United States v. Honken*, 378 F.Supp.2d 1010, 1037 (N.D. Iowa 2004)).

adequate means of providing security." *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005) (citing *United States v. Waagner*, 104 Fed.Appx. 521, 526-27 (6th Cir. 2004) (unpublished opinion) (citing *Kennedy v. Cardwell*, 487 F.2d 101, 110-11 (6th Cir. 1973))).

In Moss' case, the trial court's actions relating to the use of the Stun-Belt throughout his trial, and especially after the Shock Incident, are extremely troubling. It is undisputed that Moss was required to wear the Stun-Belt throughout his trial, that the trial court failed to articulate any reason for its use at any time, and that the initial use of the Stun-Belt was solely due to local law enforcement policy or some other unstated policy unrelated to Moss.[22] *See* Filing No. 1 at 5 (alleging Moss was forced by "police" to wear the Stun-Belt); Filing No. 10-8 at 25 (alleging it was the policy of the Sarpy County Sheriff's Department to affix and use the Stun-Belt at the beginning of Moss' trial); Filing No. 59 at 1 (agreeing with Moss that the "Stun-Belt was affixed to [Moss] at his trial due to a policy other than a policy instituted by the trial court").

The acquiescence of a trial court to courtroom law enforcement security policy (or any other policy) requiring shackling without any inquiry into the individualized necessity for their use amounts to an abuse of discretion. *See Ray v. Robinson*, 640 F.2d 474, 478 (3d Cir. 1981) ("If a district court fails to exercise its discretion, that is itself an abuse of discretion."). "While [a] trial court may rely 'heavily' on [law enforcement/courtroom security] in evaluating the appropriate security measures to take with a given prisoner, the court bears the ultimate responsibility for that determination and may not delegate the

---

[22] While it is unclear whether the trial court's decision to re-shackle Moss with a Stun-Belt following the Shock-Incident was done pursuant to law enforcement policy, it is clear from the record that it was the trial court's decision to require continued use of the Stun-Belt after the Shock Incident. *See* Filing No. 10-17 at 138 (the trial court confirmed Moss was reaffixed with the Stun-Belt following the Shock Incident prior to resuming trial).

35

decision to shackle an inmate to the marshals." *Woods v. Thieret*, 5 F.3d 244, 248 (7th Cir. 1993); *Wilber v. Thurmer*, 476 F. Supp. 3d 785, 802–03 (E.D. Wis. 2020) (citing *Lopez v. Thurmer*, 573 F.3d 484, 493 n. 4 (7th Cir. 2009) ("the actual due process decision must be made by the judicial officer. Law enforcement officials hardly can be said to be neutral in balancing the rights of the defendant against their own view of necessary security measures.")).   "A corrections officer's preference does not excuse [a trial court] from conducting the appropriate inquiry.  Nor does the convenience of shackling a defendant justify its use." *Lakin*, 431 F.3d at 964 (citing *Estelle (Williams)*, 425 U.S. at 505). Therefore, "[a]lthough a trial court might find a corrections officer's opinion highly relevant to answering the ultimate inquiry as to whether shackling is necessary in a particular case, an individualized determination under the due process clause requires more than rubber stamping that request." *Id.*  For these reasons, to the extent the trial court simply acquiesced to the policies of law enforcement personnel (or some other external policy unrelated to Moss' individualized circumstances) in requiring Moss to be affixed with the Stun-Belt, such a failure to exercise any discretion *is* an abuse of discretion.

And, even giving the trial court the benefit of the doubt in considering whether circumstances existed which *could* have allowed the trial court to shackle Moss during his trial,[23] a review of the record and the concurrence of the parties establish that no such basis existed.  Moss argues, and Respondent does not contest, that he did not have any history of escape attempts, disruption, or other danger that would suggest the need for any shackles at the time of his trial, let alone the need to re-shackle him after the Shock

---

[23] Generally, "the absence of such a finding cannot be cured by the reviewing court's after-the-fact justifications"; however, there may be an ""exceptional case where the record itself makes clear that there are indisputably good reasons for shackling." *Larson*, 515 F.3d at 1063 (quoting *Deck*, 544 U.S. at 635).

36

Incident. Filing No. 18 at 9. There is also no indication in the record that the physical state of the courtroom and/or the courthouse necessitated such restraint.

The trial court's decision to continue to utilize the Stun-Belt after the Shock Incident fares no better, especially considering counsel for both Moss and the State had concerns about prejudice against Moss resulting from the Shock Incident. *See* Filing No. 10-17 at 149-51. Indeed, it is this Court's opinion that the use of the Stun-Belt following the Shock Incident is precisely the type of prejudicial event which requires a court to further justify a shackle's use instead of continuing its unjustified use (especially as Moss did not display any change in behavior nor was there any change in any other circumstances which would have necessitated shackling). As such, because the trial court failed to address the Stun-Belt's continued use, the full burden of the trial court's failure to consider the implications of the Shock Incident and the continued use of the Stun-Belt was borne by Moss.

Ultimately, as a trial court cannot simply abdicate its discretion to utilize shackles to local law enforcement, and as no state-justified reason existed in the record for the use of the Stun-Belt either before or after the Shock Incident, the trial court clearly abused its discretion in shackling Moss with the Stun-Belt from the beginning of his trial. Further, even if the trial court had not abdicated its discretion to law enforcement (or some other unknown policy) at the beginning of Moss' trial, the fact that the trial court did not attempt to justify the Stun-Belt's use after the Shock Incident or address any potential prejudice resulting from it, and instead required Moss to be reaffixed with the Stun-Belt before trial continued, is a clear abuse of discretion.

37

### b. Prejudice

This Court now must determine whether the use of the Stun-Belt and the Shock Incident created prejudice of a constitutional nature. See *Gilmore*, 861 F.2d at 1071, cert. denied, 490 U.S. 1114 (1989). While in *Deck* the Supreme Court held that where a court failed to justify the reason for a defendant's shackling, but still ordered a defendant "to wear shackles that will be *seen by the jury*," the defendant need not establish prejudice relating to their use,[24] *Deck*, 544 U.S. at 635, this rule does not apply here because, as previously discussed, Moss failed to cite to *Deck* or any case articulating such a rule to the state courts. Nonetheless, Moss' failure to raise the rule announced in *Deck* does not render the *Deck* Court's discussion of the governing law and the constitutional principles when shackles are used at a criminal trial inapplicable.

*Deck* did not establish in the first instance a constitutional standard for imposition of shackles, nor has the Supreme Court held that only where shackles are actually seen by a jury may prejudice result. See, e.g., *U.S. v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000) (court will not "presume prejudice" where there was no evidence jurors noticed a stun-belt but prejudice may still be established); *see also Crittenden v. Calderon*, No. CV S-95-1957 FCD/GGH, 2005 WL 8156678, at *5 (E.D. Cal. June 24, 2005), aff'd sub nom. *Crittenden v. Ayers*, 624 F.3d 943 (9th Cir. 2010). Instead, in rendering its decision, the *Deck* Court relied on long standing constitutional principle addressing shackling.[25] See *Deck* 544 U.S. at 626.

---

[24] In such circumstances, prejudice to the defendant is presumed and the burden shifts to the government to "prove 'beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained.'" *Deck*, 544 U.S. at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[25] The Court in *Deck* noted the law has, for many years, forbidden shackling during the guilt phase of a defendant's trial and that the law permits shackling of a criminal defendant only when a special need exists. *Deck*, 544 U.S. at 626 ("[t]he law has long forbidden routine use of visible shackles during the *guilt* phase.")

38

There can be clearly established Federal law under a "generalized standard." *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (explaining that under the AEDPA, "rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule"); *see also Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002) ("the lack of an explicit statement" of a particular rule by the Supreme Court "is not determinative" of clearly established law, since "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent"). And, when the Supreme Court relies on a legal rule or principle to decide a case, "that [rule or] principle is a 'holding' of the Court."[26]  *Andrew v. White*, 604 U.S. 86 (2025) (citing *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) ("[C]learly established Federal law ... is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.") (internal quotation marks omitted)).

---

(emphasis added) (citing *Holbrook*, 475 U.S. at 568–569; *Allen*, 397 U.S. at 343–344). The Court explained this rule was deeply rooted in federal common law and noted it is an ancient principle that a defendant must be tried free from restraint unless there is an attendant danger of the defendant escaping. *Id.* (quoting 4 W. Blackstone, Commentaries on the Laws of England 317 (1769)). Citing to several 19th century and mid-20th century state court opinions, the Court further stated American courts have historically followed this ancient rule and quoted an 1895 treatise for the proposition that "one at trial should have the unrestrained use of his reason, and all advantages, to clear his innocence... Our American courts adhere pretty closely to this doctrine." *Id.* at 626-27 (quoting 1 J. Bishop, New Criminal Procedure § 955, p. 573 (4th ed. 1895)). According to the Court, these earlier courts came to a consensus on a general rule that shackling should only be permitted if there is a specific reason for doing so. *Id.* at 627.

[26] For example, the *Andrew* Court found that the "Eighth Amendment principle that a sentence may not be grossly disproportionate to the offense is clearly established under § 2554(d)(1), even though it arises out of a thicket of Eighth Amendment jurisprudence and lacks precise contours." *Andrew*, 604 U.S. 93 (cleaned up).

The determination that a trial court abused its discretion when it decides to shackle a criminal defendant without an articulated justifiable state interest is based on the legal principles addressed by Moss, all of which long predate *Deck*. *See, e.g.*, *Lakin*, 431 F.3d at 963 ("[T]he principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided.") (citing *Allen*, 397 U.S. 337; *Holbrook*, 475 U.S. 560). Therefore, even though the Court in *Deck* announced a new bright-line rule that a defendant need not establish prejudice when unjustified shackles able to be seen by the jury are used, it does not follow from the Court's discussion of the multiple constitutional and common law principles at play in shackling cases that no constitutional standard exists allowing a defendant to establish prejudice in its absence.

As the *Deck* Court noted when discussing the requirement that there must be governmental justification for shackling, several principles are at issue: (1) the presumption that a defendant is innocent until proven guilty; (2) the Sixth Amendment right to counsel and participation in one's own defense; and (3) the dignity and decorum of the judicial process, including "the respectful treatment of defendants." *Deck*, 544 U.S. at 630–31. Each principle addresses the same general issue—the wearing of shackles by a defendant in front of a jury—but focuses on the effect shackles have as related to three different groups: jurors, defendants, and courts. As there is also no Supreme Court precedent requiring a federal habeas petitioner to establish any particular principle (or a combination thereof) relating to shackling, this Court now considers each potential avenue to establish prejudice and determines that in Moss' case, the Shock Incident and his subsequent re-shackling established prejudice relating to all three.

40

The first principle focuses on the effect a defendant's shackling has on a jury's ability to presume a criminal defendant's innocence. The presumption of innocence in favor of the accused is "the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895). A person accused of a crime is "entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 484–85 (1978) (citing *Estelle (Williams)*, 425 U.S. 501); *Smith v. Phillips,* 455 U.S. 209, 217 (1982) (A defendant is entitled to a "jury capable and willing to decide the case solely on the evidence before it.").

In *Taylor*, the United States Supreme Court described the connection between the presumption of innocence, and the burden of proof jurors must consider when determining guilt or innocence, as follows:

> In a criminal case the term [presumption of innocence] does convey a special and perhaps useful hint over and above the other form of the rule about the burden of proof, in that it cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced. In other words, the rule about burden of proof requires the prosecution by evidence to convince the jury of the accused's guilt; while the presumption of innocence, too, requires this, but conveys for the jury a special and additional caution (which is perhaps only an implied corollary to the other) to consider, in the material for their belief, nothing but the evidence, i. e., *no surmises based on the present situation of the accused*.

436 U.S. at 484–85 (cleaned up) (emphasis added). A defendant's shackling clearly falls into the category of an outside influence that the jury must overlook to the best of their ability when determining guilt or innocence. *Id.*

41

In the event a court "erroneously shackles a defendant, the jury receives a powerful image contradicting the presumption of innocence." *Hatten v. Quarterman*, 570 F.3d 595, 603 (5th Cir. 2009). And, even if even one juror is biased by the sight of shackles, prejudice can result. *See Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (citing *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors")).

Shackles can erode a jury's ability to presume a defendant's innocence via negatively influencing their perception of a defendant's credibility. *Davis v. Mathena*, No. 2:12CV92, 2014 WL 1308694, at *25 (E.D. Va. Mar. 27, 2014) ("Even though it might not have been an explicit or a conscious decision by the jurors, it was likely much easier for them to believe the testimony of witnesses wearing a badge, than the testimony of Davis, who was wearing shackles."). Seeing a defendant in shackles may also affect a jury's perception of the *character* of the defendant in an inevitably negative way. *See Deck* at 633 (emphasis added) (citing *Zant v. Stephens*, 462 U.S. 862, 900 (1983) (REHNQUIST, J. concurring in judgment)). This is so as the use of shackles likely suggests to a jury that the court itself views the defendant as someone who is dangerous and must be physically isolated from others in the courtroom. *Id.* at 630 (citing *Holbrook*, 475 U.S. at 569; *State v. Roberts*, 206 A.2d 200, 202 (N.J. App. Div. 1965)). And, if a jury is aware a defendant is shackled with a stun-style shackle, "the [stun-style shackle] 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" *Durham*, 287 F.3d at 1305 (quoting *State v. Flieger*, 955 P.2d 872, 874 (Wash. App. 1998)).

42

Before considering to what extent the jury was aware of Moss' shackling, it is important to first address what awareness in the shackling context means.  Some courts, relying on the use of the word "visible" in the *Deck* decision, focus entirely on whether a jury *saw* the defendant's shackles with their own eyes as the gateway requirement to any prejudice finding, determining that if a jury did not actually see a defendant's shackles, then no jury prejudice exists.[27]  *See, e.g., Williams v. Woodford*, 384 F.3d 567, 592–93 (9th Cir. 2004) ("When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial.") (citing *Castillo v. Stainer*, 983 F.2d 145, 148 (9th Cir. 1992), amended by 997 F.2d 669 (9th Cir. 1993)).  The *Deck* opinion does not match up with such absolute reasoning.

Deck was a criminal defendant sentenced to death for robbing, shooting, and killing an elderly couple.  *Deck*, 544 U.S. at 624–25.  On appeal, the state supreme court upheld Deck's conviction but set aside his sentence and a new sentencing proceeding was held. *Id.* (internal citation omitted).  The *Deck* Court described Deck's appearance at his second sentencing as follows:

> From the first day of the new proceeding, Deck was shackled with leg irons, handcuffs, and a belly chain.  Before the jury voir dire began, Deck's counsel objected to the shackles. The objection was overruled.  During the voir dire, Deck's counsel renewed the objection. The objection was again overruled, the court stating that Deck "has been convicted and will remain in leg irons

---

[27] There is much discussion in state and federal decisions addressing shackling over the use of the word "visible" in the *Deck* opinion.  Indeed, as noted by the Sixth Circuit, the Court in *Deck* stressed "at least six times" that its holding related to "visible" shackles.  *See Earhart v. Konteh*, 589 F.3d 337, 348 (6th Cir. 2009).  However, stun-style devices are <u>not</u> invisible and instead are just as capable of being seen by jurors as leg irons. *United States v. Busch*, 411 F. App'x 872, 876–77 (6th Cir. 2011) (Reviewing where and how a stun style shackle was used at a defendant's trial when determining whether a jury was aware a defendant was shackled).  The difference is that stun-style shackles are typically easier to disguise or hide, making it less *likely* a jury is able to see or otherwise *perceive* their use, as illustrated by the Eighth Circuit's discussion of the jury's awareness of a traditional leg iron in *Cole v. Roper*, 623 F.3d 1183, 1193 (8th Cir. 2010) (finding that because in Cole's case the jury was likely not *aware* Cole was shackled with a knee restraint style shackle due to its appearance, even though the restraint was potentially visible to the jury, the knee restraint was not able to cause any jury prejudice) (citing *Deck*, 544 U.S. at 632).

43

and a belly chain." After the voir dire, Deck's counsel once again objected, moving to strike the jury panel "because of the fact that Mr. Deck is shackled in front of the jury and makes them think that he is ... violent today." The objection was again overruled, the court stating that his "being shackled takes any fear out of their minds." The penalty phase then proceeded with Deck in shackles. Deck was again sentenced to death.

*Id.* at 625 (internal citations omitted).

Deck appealed, alleging that his shackling at his second sentencing violated both Missouri law and the Federal Constitution. The state, however, argued that Deck's wearing of shackles at his sentencing did not violate due process because "the record lacks evidence that the jury *saw* the restraints." *Id.* (emphasis added).

The Court found the state's argument unconvincing, first explaining that the state court did not find the jury was unaware of Deck's shackles and instead simply did not make any findings regarding the extent the jury was *aware* of them. *Id.* at 634 (emphasis added). The Court then focused on the portion of the trial court record which made clear that the jury was *aware* of Deck's shackles without having to establish the jury saw them with their eyes: the oral discussion between counsel and the court about Deck's shackling in front of the jury. *Id.* This discussion, coupled with the fact that Deck was restrained with shackles capable of being seen by the jury, resulted in the Court's bright line rule that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. Thus, the *Deck* decision did not limit the ability of a shackled defendant to establish prejudice only in instances where shackles are able to (or were) seen by the eyes of a jury. Instead, a criminal defendant must prove prejudice to prevail where it is questionable as to whether the shackles were indeed seen or perceived by jurors. *See, e.g.*, *Shirley v. Tegels*, 61 F.4th 542, 548 (7th Cir. 2023)

44

(Hamilton, J., concurring) (it is a juror's knowledge or awareness of a defendant's shackling, not through which sense it was acquired, which implicates the fundamental legal principles at issue in courtroom shackling) (citing *Deck*, 544 U.S. at 630–33).

The position that judicial determinations such as *Deck* and the principles it relies upon addressing traditional shackles do not apply to stun-style shackles simply because *Deck*, and similar cases like *Allen*, *Estelle (Williams)*, and *Holbrook*, involved traditional shackles is inconsistent with the Court's recent holding in *Andrew* discussed *supra* because the constitutional principles at issue are the same.[28]  *See Andrew*, 604 U.S. at 93.  Therefore, while federal habeas courts should not automatically "presume prejudice" where there is no evidence jurors actually saw a defendant's shackles, *see, e.g.*, *McKissick*, 204 F.3d at 1299, a defendant may still provide evidence that shackling undercut the presumption of innocence principle by establishing that the jury was *aware* that he was shackled or restrained, *see, e.g.*, *United States v. Maness*, 112 F. App'x 610, 611 (9th Cir. 2004) (emphasis added) (citing *United States v. Collins*, 109 F.3d 1413, 1418 (9th Cir. 1997)).

In Moss' specific circumstances, to claim that the jury was somehow unaware that Moss was shackled is disingenuous.  Many courts have hypothesized that the activation of a stun-style device alone would automatically alert the jury to its use and prejudice the defendant. *See, e.g.*, *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 784 (N.D. Ohio 2007),

---

[28] In the case of stun-style shackles, it is important to note that "[h]owever technologically removed a stun belt may be from its clanking predecessors, it serves the same incapacitating function and, if perceived by the jury, will be understood as the modern-day equivalent of manacles." *Stephenson v. Wilson*, 629 F.3d 732, 733 (7th Cir. 2011); *see also Stephenson v. State,* 864 N.E.2d 1022, 1033 (Ind. 2007) ("The use of a stun belt, if perceived by the jury, produces all of the results that shackling does.").  Indeed, while the use of concealed shackles tends to lessen the concerns relating to jury bias because a jury is less likely to know they are being used, their use does not erase such concerns where jury awareness exists.

45

aff'd, 817 F.3d 284 (6th Cir. 2016), opinion amended and superseded, 826 F.3d 306 (6th Cir. 2016), and aff'd, 826 F.3d 306 (6th Cir. 2016); *U.S. v. Joseph*, 333 F.3d 587, 591 (5th Cir. 2003) (indicating that while the use of stun-style shackles was not prejudicial where the jury was unaware of their use, jury prejudice would arise if a stun-style shackle activated in front the jury) (citing *Holbrook*, 475 U.S. 568–69).  But more importantly, courts which have addressed actual accidental discharges in front of a jury generally presume awareness.

For example, the Fifth Circuit in *Chavez v. Cockrell* described the accidental discharge of a stun-style shackle during a defendant's criminal trial as giving the jury a "momentary glimpse" of the stun-belt via their witnessing its effect even though the device itself remained unseen.  310 F.3d 805, 809 (5th Cir. 2002) (finding that the prejudice resulting from the shock was not cause for granting the writ because the trial court had made previous findings allowing for the use of traditional shackles).  In *Hollaway v. State*, the Nevada Supreme Court found that the unexplained shock to a defendant in front of the jury revealed the defendant's shackling, prejudiced his defense, completely disrupted the proceedings, and necessitated the removal of jurors from the courtroom.  *Hollaway v. State*, 116 Nev. 732, 742, 6 P.3d 987, 994 (Nev. 2000), o*verruled on other grounds* by *Lisle v. State*, 351 P.3d 725 (Nev. 2015)).

Here, this Court finds that the Stun-Belt's activation alone is adequate evidence that the jury was aware of, or otherwise perceived, that Moss was shackled especially considering the record before this Court.  The shock received by Moss occurred while he was seated next to his counsel during a State witness' testimony near the jury (as both described by the trial court on the record after the Shock-Incident occurred and as

46

transcribed in the trial transcript) and was preceded by a "noise" prior to the Stun-Belt's discharge, immediately followed by Moss' scream. Filing No. 10-17 at 138. The trial court described its attempt to redirect attention from Moss to the witness who was testifying immediately after the Shock Incident, before eventually turning to Moss' counsel and asking if a break was necessary and then excusing the jury without explanation and halting the proceedings. *Id.*

Prior to the trial resuming, counsel for the parties all acknowledged the Shock Incident and the potential prejudice it created, not by arguing the jury was unaware of the Shock Incident, but by discussing how jury prejudice potentially could be overcome.[29] Further, after the trial was over, Moss' counsel, in conjunction with a motion for new trial, interviewed several jurors who told him they recognized Moss was shackled with an electronic shackle after (and, in at least one instance, before) the Shock-Incident. Filing No. 18 at 4; Filing No. 10-19 at 80 (alleging Moss' counsel spoke to an alternate juror about why she thought Moss jumped up during the trial and she said, "I thought they had a bracelet around his leg that went off and that he's in custody."); *see also* Filing No.10-11 at 14-15, 17 (affidavit of Sharon Jones and corresponding notes stating she spoke with juror Tomaziedwicz who believed Moss had been "zapped by some leg device.").

Finding jury awareness, this Court must now determine to what degree that awareness impacted the presumption of innocence[30] as, although a jury's perception that

---

[29] The prosecution argued that any jury prejudice due to the Shock Incident could be cured by a jury instruction or other admonishment whereas Moss' counsel argued that the jury's awareness of the shackling and the resulting prejudice was so severe that the charges against Moss should be dropped. Filing No. 10-17 at 149-51.

[30] As jury prejudice is difficult to discern from a record alone, the degree of the awareness of the use of shackles is typically the lynchpin when determining if prejudice resulted. *Deck*, 544 U.S. at 634–35 (explaining that the degree of the jury's awareness of a defendant's shackles was pertinent to "the kinds of

47

a defendant is restrained may impact the jury's ability to presume innocence, knowing a defendant is shackled does not necessarily rise to an unacceptable constitutional level of prejudice.  However, the Court shall first discuss the second principle addressing the effect shackling has on a criminal defendant's Sixth Amendment rights, including the "right to a fair opportunity to defend against the State's accusations," *see Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), as it dovetails into this Court's ultimate finding of prejudice in Moss' circumstances on both principles.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *see also Rock v. Arkansas*, 483 U.S. 44, 52 (1987); *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citing *Crane*, 476 U.S. 690). Encompassed in this right to present a "complete defense"[31] is the constitutionally guaranteed right for a criminal defendant to be present at his trial, to testify in his own defense, to communicate with his counsel, and to confront witnesses against him.  *Allen*, 397 U.S. at 343 (The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross examine adverse witnesses at all stages of the trial.); *Rock*, 483 U.S. at 52 (The Compulsory Process clause of the Sixth Amendment includes a defendant's "right to testify" about "his own version of events

---

prejudice that might have occurred."). "[T]he greater the intensity of shackling . . . the greater the extent of prejudice." *Spain v. Rushen,* 883 F.2d 712, 722 (9th Cir. 1989).

[31] The constitutional guarantee of "a meaningful opportunity to present a complete defense" has its roots "directly in the Due Process Clause of the Fourteenth Amendment [and] in the Compulsory Process or Confrontation clauses of the Sixth Amendment." *Crane*, 476 U.S. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

48

in his own words."); *United States v. Braman*, 33 F.4th 475, 479 (8th Cir. 2022) ("The right to be present at trial implicates the Sixth Amendment right to counsel, as '[t]he defendant's ability to communicate with counsel in court remains one of the defendant's primary advantages of being present at the trial.'") (quoting *Moore v. Purkett*, 275 F.3d 685, 688 (8th Cir. 2001) (quotation omitted)).

Traditional shackles have been found to potentially interfere with these rights,[32] as have stun-style shackles. *See, e.g., Gonzalez v. Pliler*, 341 F.3d 897, 899 (9th Cir. 2003) (explaining that stun-style shackles are no different than more traditional methods of shackling, as they raise "all of the traditional concerns about the imposition of physical restraints"). And, while "physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint", *see Larson,* 515 F.3d at 1064, a stun-style shackle may affect a defendant's appearance and behavior in other negative ways that more traditional shackles do not. This is so as "[i]t is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the [stun-style shackle]." *Durham*, 287 F.3d at 1305–06 (citing *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir. 1983) (citing *Estelle (Williams)*, 425 U.S. at 503, *Allen*, 397 U.S., at 344))). Thus, "[w]earing a stun belt is a considerable impediment to a defendant's ability to follow

---

[32] *See Deck*, 544 U.S. at 631 (citing *People v. Harrington*, 42 Cal., 165, 168 (1971) (explaining that the "impo[sition of] physical burdens, pains, and restraints, tend to confuse and embarrass defendants' mental faculties."); *Gideon v. Wainwright*, 372 U.S. 335, 340–341(1963); *Allen*, 397 U.S. 344; *see also Kennedy*, 487 F2d 101, cert den 416 US 959, (shackling may confuse and embarrass the accused's mental faculties, subject the accused to physical pain or torment before he is found guilty; and interfere with the accused's ability to communicate with his counsel); *Stephenson v. State*, 864 N.E.2d 1022 (Ind. 2007) (shackling can interfere with the defendant's ability to communicate with his lawyer and participate in his defense)).

the proceedings and take an active interest in the presentation of his case." *Durham*, 287 F.3d at 1306.

A criminal defendant's ability to testify, especially in a case where the majority of the evidence supporting a conviction requires a jury to determine witness credibility, is of the utmost importance to the outcome of a trial. As further discussed by the Ninth Circuit:

> Stun belts, for example, may pose a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles. We have long noted that one of the defendant's primary advantages of being present at the trial is his ability to communicate with his counsel. Stun belts may directly derogate this primary advantage, impacting a defendant's right to be present at trial and to participate in his or her defense.
>
> . . .
>
> For like reasons, a stun belt may *materially impair and prejudicially affect a defendant's privilege of becoming a competent witness and testifying in his own behalf*. In the course of litigation, it is not unusual for a defendant, or any witness, to be nervous while testifying. In view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict, however, it is reasonable to believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt while testifying at trial. This "increase in anxiety" may impact a defendant's demeanor on the stand; this demeanor, in turn, impacts a jury's perception of the defendant, thus risking material impairment of and prejudicial affect on the defendant's privilege of becoming a competent witness and testifying in his own behalf.

*Gonzalez*, 341 F.3d at 900–01 (emphasis added, internal citations and quotations omitted); *see also Durham*, 287 F.3d at 1305 ("[t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial."); *People v. Mar,* 52 P.3d 95, 97, 105, 110 (Cal. 2002) (explaining that while not unusual for witnesses including defendants, to be nervous while testifying, "in view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict, it is reasonable to

50

believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt while testifying at trial[,]" potentially impacting a defendant's demeanor on the stand and, in turn, impacting a jury's perception of the defendant, risking material impairment of and prejudicial effect on the defendant's ability to competently testify on his own behalf) (internal quotation and citation omitted).  Moss' claim that his own testimony was dramatically and negatively affected following the Shock Incident is not only well within reason but wholly expected.

As noted by a multitude of courts, "when a case boils down to a 'he said-she said,' such as here, the importance of the defendant's credibility and testimony escalates." *Mireles v. State*, 413 S.W.3d 98, 103 (Tex. App. 2013) (citing *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992), abrogated on other grounds by *Meadows v. State*, 455 S.W.3d 166 (Tex. Crim. App. 2015); *see, e.g.*, *Plymail v. Mirandy*, 8 F.4th 308, 319 (4th Cir. 2021), as amended (Sept. 7, 2021) (explaining that rape cases often are battles of credibility between the accuser and the accused); *Nelson v. Robey*, No. 5:22-CV-00116-JHM-LLK, 2023 WL 11947191, at *4 (W.D. Ky. Oct. 18, 2023) (explaining that in a forcible rape case the determination of a jury relating to who to believe "came down to witness credibility"), report and recommendation adopted, No. 5:22-CV-00116-CRS, 2023 WL 11947190 (W.D. Ky. Dec. 1, 2023); *State v. Seaton*, 16 N.W.3d 20, 28 (Wi. App. 2024) (credibility is "particularly probative" in cases that largely rely upon conflicting witness testimonial evidence).  When a defendant appears bound, it is likely the jury will "suspect the witness's credibility," *Kennedy*, 487 F.2d at 105, n. 5, equating to a greater potential for jury prejudice when specialized stun-style shackles such as a stun-belt are used as they may imply that a defendant is especially dangerous, *Durham*, 287 F.3d at 1305.

51

In fact, regardless of whether a jury is aware of the use of a stun-style shackle, as previously discussed, its use alone likely serves as a distraction to a defendant, potentially increasing nervousness and/or anxiety, which may potentially, albeit indirectly, impact a jury's character and credibility determination about the defendant (and, consequently, may potentially impact the presumption of innocence because of the defendant's appearance before them, especially when providing testimony in his own defense). This is important because of the impact on both a defendant's ability to focus on his case when testifying and also on the jury's determination of credibility, which is established, at least in part, by their personal observations of the appearance and demeanor of a witness. *See, e.g.*, *United States v. Edwards*, 469 F.2d 1362, 1370 (5th Cir. 1972); *see also People v. Speights*, 56 A.D.3d 1232, 1233, 868 N.Y.S.2d 429, 430 (2008) (especially when a defendant's credibility is of paramount importance to the determination of guilt or innocence, a court must give great deference to a fact-finder's credibility assessment because the fact-finder had the "opportunity to view the witnesses, hear the testimony and observe demeanor"). For example, a defendant's choice of words, or the tone in which they are said, or a defendant's heightened state of nervousness may be seen as an "indicator of credibility." *Commonwealth v. Woolery*, No. 1719 MDA 2023, 2025 WL 1146625, at *4 (Pa. Super. Ct. Apr. 16, 2025) (explaining that where a defendant appears unusually nervous, for example, a jury may believe he is less likely to tell the truth). Therefore, the use of a stun-style shackle alone can impact a defendant's demeanor and consequently (albeit potentially inadvertently) the jury's decision regarding the defendant's credibility.

52

Clearly, while there is legitimate concern regarding the use of stun-style shackles and their impact on a defendant's Sixth Amendment rights, the activation of a stun-style shackle naturally intensifies the risk of prejudice even further. *See, e.g.*, *Calvert v. State*, No. AP-77,063, 2019 WL 5057268, at *9 (Tex. Crim. App. Oct. 9, 2019) (citing *Durham*, 287 F.3d at 1306). When hypothesizing about the effect of shocks from stun-style shackles on a defendant, courts have found that "it is unreasonable to expect a defendant to meaningfully participate in the proceeding following a shock," and "the defendant may presume that other conduct, even if appropriate, may result in other shocks" further exacerbating his ability to participate. *Hawkins v. Comparet*-Cassani, 33 F. Supp. 2d 1244, 1262 (C.D. Cal. 1999), opinion modified on reconsideration (Feb. 5, 1999), rev'd in part on other grounds, 251 F.3d 1230 (9th Cir. 2001).

While there is no bright-line rule or set factors courts look to when determining if the use of stun-style shackles resulted in unconstitutional prejudice, courts addressing the use of stun-style shackles have considered: the nature of the charges against the defendant, the stage (or stages) of the proceeding in which the stun-style shackle allegedly impacted the defendant, and indications in the record that the shackle inhibited a defendant's ability to communicate with his counsel and/or inhibited a defendant's ability to participate in his own defense, including testifying on his own behalf and being present at all stages of his trial.[33] Although thankfully such events occur less frequently, courts

---

[33] *See, e.g.*, *Johnson v. Gaetz*, 743 F. Supp. 2d 820 (N.D. Ill. 2010) (reviewing the record for evidence that the stun-style shackle inhibited his ability to communicate with his attorney or to participate in his defense); *Gonzalez*, 395 Fed. Appx. 453 (considering effect stun-style shackle had on a defendant's ability to communicate with counsel); *Mar*, 52 P.3d 95, as modified, (Sept. 11, 2002) (analyzing a stun-style shackle's impact on a defendant's right to present a defense); *Floyd v. State*, 289 So. 3d 337 (Ala. Crim. App. 2017) (considering whether a defendant's claim that requiring him to wear a stun device prejudiced him via infringement of his ability to participate in his trial and to communicate with his counsel).

addressing actual shock incidents focus on similar concerns: whether a defendant remained physically present at his trial, if he was able to confer with his counsel, the effect the shock had on his ability to participate in his own defense, whether the use of traditional shackles was previously found to be justified, and whether the jury was present when the shock occurred.[34]    Finally, Justice Thomas' dissent in *Deck* addressing a defendant's Sixth Amendment rights is particularly instructive here as, while he disagreed with the majority's decision relating to the presumption of innocence and courtroom decorum, he "certainly agree[d] that shackles would be impermissible if they were to seriously impair a defendant's ability to assist in his defense," describing examples of such impairment as when shackles caused a defendant pain, impaired his mental faculties, or otherwise impaired his ability to communicate with counsel.  *Id.* at 655 (citing *Riggins v. Nevada,* 504 U.S. 127, 154, n. 4 (1992) (THOMAS, J., dissenting)).

---

[34] *See Morris v. State*, 554 S.W.3d 98, 117, 118 (Tex. App. 2018) (finding prejudice to a defendant's right to participate in his defense and be present at trial where there was evidence that the activation of a stun-belt caused the defendant's absence from most of the trial proceedings because he was afraid to be in the courtroom) (citing *Deck*, 544 U.S. at 630; *Allen*, 397 U.S. at 339; *Holbrook*, 475 U.S. at 569); *State v. Belcher*, 183 S.W.3d 443, 445 (Tex. App. 2005) (shock outside the jury's presence caused defendant to miss conferring with his counsel regarding the exercise of peremptory strikes during voir dire) (citing *Allen*, 397 U.S. at 339); *Chavez*, 310 F.3d at 809 (finding no prejudice to the presumption of innocence but only after the jury was questioned regarding their ability to remain unbiased and because the court had previously found legitimate state interests justified the use of shackles generally); *Harrison v. Yarborough*, 2006 WL 735986 (E.D. Cal. 2006) (no prejudice to presumption of innocence where defendant accidentally shocked outside the jury's presence during jury deliberations after the trial's conclusion), *summarily aff'd*, 211 Fed. Appx. 653 (9th Cir. 2006); *Weaver v. State*, 894 So. 2d 178 (Fla. 2004) (defendant representing himself accidentally shocked during voir dire did not object to the shock, request a retrial and failed to allege how the shock affected his performance); *State v. Wachholtz*, 952 P.2d 396, 397-99 (Idaho Ct. App. 1998) (no prejudice to presumption of innocence where defendant accidentally shocked outside of potential jury's presence and no Sixth Amendment prejudice because the defendant's behavior during trial contradicted his claim of serious pain, no medical evidence supported his claim, and defendant was able to confer with his counsel during all aspects of his trial); *Calvert v. State*, No. AP-77,063, 2019 WL 5057268, at *10 (Tex. Crim. App. Oct. 9, 2019) (finding no indication in the record that "the shock cuff's activation affected Appellant's ability to confer with counsel and participate in his defense.")

In Moss' case, there is evidence of many of the factors demonstrating prejudice especially as Moss' credibility was paramount to his trial's outcome: physical pain,[35] mental impairment, a lack of ability to communicate with counsel, and the inability to be present for all aspects of his trial. Moss screamed out loud when receiving the shock; during the break immediately following, his counsel informed the trial court he was mentally a "basket case" and requested the trial conclude for the day; and Moss was unable to be present at the meeting between the parties and the trial court where the Shock Incident and its effect on the trial were discussed. Moreover, the trial continued after the trial court was informed of Moss' compromised mental state, and Moss has described in detail the psychological effect of the Stun-Belt's continued use on his own testimony the following day, causing him nervousness and heightened fear of an additional shock.

Moss has consistently explained both to this Court and the state courts how the Shock Incident affected his credibility with the jury. In his Direct Appeal, he contended that because "the only question the jury sought an answer to, literally, was whether or not Moss ceased his sexual advances toward the alleged victim . . . once [K.E.] expressed her desire to end the encounter," his credibility when describing his version of the events at issue was of the utmost importance. Filing No. 10-8 at 20 (characterizing the most relevant decision of his trial as one where the jury had to make a credibility determination and decide whether they believed Moss' testimony or that of K.E.). He further argued that his credibility with the jury was irreparably harmed due to the Shock Incident. *Id*. at 21 (arguing that when the jury realized, due to the warning beeps and then the administration

---

[35] *See* Filing No. 10-17 at 137-38.

55

of the shock, that Moss was wearing a stun-style shackle and was actually shocked for reasons never explained to them, his credibility was irreparably harmed as the jury was left to perceive him as in custody, possibly violent, dangerous, or unpredictable as no "other rational conclusion could be drawn from such an unforeseen spectacle in a normally civilized courtroom"). Moss has also consistently argued he was apprehensive, nervous, and fearful of another "accidental" discharge but was unable to hide his unease from the jury, "which jurors might interpret incorrectly as signs of guilt." Filing No. 10-8 at 24; *see also* Filing No. 1 at 64 (reiterating that his focus and demeanor during his testimony was compromised as he was concerned about receiving another shock).

As is typical with cases involving sexual assaults, the determination of whether K.E. consented to their sexual interaction involves a battle of credibility between the accuser and the accused, as there were no other witnesses to the event. *See, e.g.*, *Mirandy*, 8 F.4th at 319, as amended (Sept. 7, 2021) (explaining that rape cases often are battles of credibility between the accuser and the accused); *Nelson*, 2023 WL 11947191, at *4, (explaining that in a forcible rape case the determination of a jury relating to who to believe "came down to witness credibility"). Importantly here, and as noted by the Nebraska Court of Appeals, while the evidence against Moss was merely "sufficient," in convicting Moss, it was *necessary* for the jury to determine that "K.E. was more credible" in order to find "beyond a reasonable doubt that Moss subjected her to sexual penetration without her consent." Filing No. 10-3 at 9 (emphasis added). A review of the record supports the necessity of K.E.'s and Moss' credibility to the determination of guilt or innocence on the sexual assault charge.

56

The events which support the sexual assault charge against Moss occurred while only he and K.E. were in a hotel room sometime in the early morning hours of May 15. As recounted by the state appellate court, K.E. testified that while in the hotel room the second time Moss asked K.E. if they could make love, but K.E. told him no. Filing No. 10-3 at 4. She further testified that, even though she told Moss she did not want to, he "forcibly pulled her jeans off and penetrated her vagina with his penis" but he stopped as K.E. continued to resist. *Id.* Moss, on the other hand, testified that he and K.E. returned to his hotel for the second time around 3:30 a.m. on May 15 to go to sleep, which they did until around 4:30 a.m. when K.E. awakened him because she had to go to work. Filing No. 10-18 at 134. He specifically testified that he woke up to K.E. "wiggling her butt" into him in a sexual way and that they began to be intimate "for a second" but stopped before Moss ejaculated because they started talking about K.E.'s needing to leave so she could get to work. *Id.* at 134–35. Resolution of this matter naturally required the jury to determine who was more credible as no other witnesses were present.

Kidnapping cases also often rely on credibility determinations as purported victims and the accused kidnapper are often the only witnesses to the alleged crime. *See, e.g.,* *MacPhail v. Pepe*, No. CIV.A.99-11116-RWZ, 2004 WL 1305858, at *1 (D. Mass. June 14, 2004) (discussing the credibility of a habeas petitioner's testimony relating to an alleged kidnapping where the petitioner and the alleged victim were the only witnesses aside from minimal corroborating evidence). Here, the kidnapping charges stem from events which occurred after K.E. voluntarily met with Moss, and, while some of their interactions were witnessed by others, the majority of the events at issue occurred when no one else was present, again requiring the jury to assess the credibility of K.E. and Moss. *See* Filing

57

No. 10-3 at 3-4 (the state appellate court found that K.E.'s testimony established that she felt terrified and unable to leave Moss' presence after K.E. and Moss returned to his hotel room for the second time in the early morning of May 15, through when K.E. exited the vehicle Moss was driving several hours later while stopped at a red light, outside the presence of others).

K.E. and Moss agreed that they went to several bars and had several drinks at each, as well as to a gas station and to a friend's house together before returning to Moss' hotel.  During these outings, many people were present and K.E. had multiple opportunities to leave or inform others she wanted to but allegedly opted to pretend to get along with Moss to appease him.  During that time, despite testifying that she still felt "in control" of the situation and able to leave, K.E. testified that she attempted to leave notes at two bars instructing people that she was with Moss and to call her father to get help, listing his cell phone number, Filing No. 10-15 at 232-34, but none of the notes were ever found or presented to support her testimony.  And, while the remainder of the evidence corroborated portions of K.E.'s testimony with several witnesses testifying she exited Moss' vehicle in distress, to the extent K.E.'s testimony was relatively consistent with the version of events she told others after the fact, the bulk of the evidence against Moss regarding being held under terrorizing circumstances consists of K.E.'s testimony that she felt trapped or otherwise unable to leave him.

Moss testified that, contrary to K.E.'s testimony, K.E. willingly accompanied him throughout the time they were together on May 14 and 15.  Filing No. 10-3 at 4.  He testified that while at a bar, K.E. asked him if he wanted to have sex and they went to the hotel and had consensual sex.  Moss acknowledged arguing with K.E. in his vehicle on

the morning of May 15 and grabbing her arm as she exited the vehicle, but he claimed he grabbed her to her to keep her from falling out of the vehicle because she was intoxicated. Filing No. 10-3 at 4; Filing No. 10-18 at 138-40.  Therefore, the determination of whether Moss' actions terrified K.E. and rendered her unable to leave his presence also required the jury to determine whose description of events they believed.

As credibility is "particularly probative" in cases such as this one that largely rely upon conflicting witness testimonial evidence, *see Seaton*, 16 N.W.3d at 28, the damage to Moss' credibility with the jury from the Shock Incident and having to testify before that jury the following day still wearing the Stun-Belt was amplified.  *See Mireles*, 413 S.W.3d at 103 (explaining that "when a case boils down to a 'he said-she said,' the importance of the defendant's credibility and testimony escalates.") (citing *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992), abrogated on other grounds by *Meadows*, 455 S.W.3d 166; *Kennedy*, 487 F.2d at 105, n. 5 (explaining that when a defendant appears bound, it is likely the jury will "suspect the witness's credibility.").  Therefore, the danger of prejudice to Moss' credibility via the use of the Stun-Belt, especially after the Shock Incident and regardless of the jury's awareness of the Stun-Belt's continued use when he testified (as it was at least unclear whether Moss remained restrained), was severe.

And, even assuming arguendo that the jury remained unaware of the use of the Stun-Belt, the jury could erroneously equate any nervousness or anxiety they perceived in Moss' testimony with a lack of credibility, when his nervousness/anxiety may have related, at least in part, to its continued use.  If they were aware, the presumption of innocence would be juxtaposed with their belief Moss' shackles were required because of behavior attributable to Moss.  However, ultimately, the jury was left to make their own

assumptions for the reason Moss was both shackled and shocked because the Shock Incident was not discussed with them until after the trial had ended.

Because of the paramount importance that credibility played in the outcome of Moss' trial, and because the jury was aware of his shackling at least at the time of the Shock Incident but received no explanation or guidance from the trial court regarding the use of the Stun-Belt, the unknown reason for the shock, or whether Moss remained shackled with the Stun-Belt after the Shock Incident occurred, and because this Court finds Moss' repeated statements that he was nervous and unable to focus properly on his testimony following the Shock Incident credible, this Court finds that the prejudice to both the presumption of innocence and Moss' Sixth Amendment rights reached constitutional magnitude.

The final principle is courtroom decorum which focuses not on perceptions, but on judicial responsibility for the dignity and decorum that preserves the judicial process. *Deck*, 544 U.S. at 631 ("[J]udges must seek to maintain a judicial process that is a dignified process."); *see also Ochoa v. Workman*, 669 F.3d 1130, 1140 (10th Cir. 2012) ("[I]t is the trial judge's responsibility to control the decorum of the courtroom."). The use of shackles and gags is "something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Allen*, 397 U.S. at 344.

> The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve.

*Deck*, 544 U.S. at 631.

60

When addressing courtroom decorum and stun-style shackles, some courts have found that stun-style shackles do not implicate the dignity and decorum of judicial proceedings because they "are much less conspicuous and disruptive than the examples the Supreme Court has previously determined threaten the courtroom's formal dignity." *See, e.g.*, *United States v. Wiley*, 103 F.4th 565, 574 (9th Cir. 2024) (cleaned up) (citing *Deck*, at 631–32; *Allen*, 397 U.S. at 344), cert. denied, *Wiley v. United States*, 145 S. Ct. 1929, 221 L. Ed. 2d 667 (2025).  However, the administration of a shock to a defendant by a stun-style shackle in front of the jury does not fall into such a category.  *See Durham*, 287 F.3d at 1307 (describing the accidental triggering of a defendant's stun belt during trial as an "egregious breach of both appropriate courtroom decorum and [the defendant's] most fundamental trial rights.").  Further, courts addressing actual shocks occurring in front of a jury for unexplained reasons look to what occurred following the shock when considering whether a defendant's constitutional rights were implicated, including the efforts the trial court took to ensure the defendant's trial could proceed, because of the high potential for prejudice resulting from such an event.  *See, e.g.*, *Chavez*, 310 F.3d at 809.

Here, unlike other courts addressing a defendant shocked in the jury's presence, the trial court did little to address it aside from taking a short recess and listening to the parties discuss how the Shock Incident affected Moss and how any prejudice resulting from the Shock Incident could be rectified.  And, ultimately, the trial court declined to address prejudice at that time, declined to inform or otherwise instruct the jury about what occurred, and instead simply reaffixed Moss with a Stun-Belt and resumed trial.  Such a failure clearly offends the dignity of the proceedings.

61

For these reasons, this Court finds that Moss established prejudice under all three principles.

### c. *Brecht* – harmless error

Although this Court finds the trial court's imposition of shackles was an abuse of discretion and that Moss suffered prejudice as a result, this Court must nonetheless assess whether this error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotation marks omitted); *Rhoden v. Rowland,* 172 F.3d 633, 637 (9th Cir.1999); *see also Gonzalez*, 551 U.S. 112 (holding that *Brecht* harmless error review applies whether or not the state court recognized the error and reviewed it for harmlessness).  That is, in Moss' case, he must establish that the unjustified use of the Stun-Belt throughout his trial had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht,* 507 U.S. at 623.  If not, the error is "harmless" and the writ cannot be granted.

Review for harmless error under *Brecht* is "more forgiving" to state court errors than the harmless error standard the Supreme Court applies on its direct review of state court convictions.  *See Gonzalez*, 551 U.S. 112 (contrasting *Brecht* with *Chapman*'s "harmless beyond a reasonable doubt" standard).  And under *Brecht*, "in cases of grave doubt as to harmlessness the petitioner must win." *O'Neal v. McAninch,* 513 U.S. 432, 437 (1995).  Such is the case here.

The strength of the evidence against a defendant is frequently the reason why a petitioner is not granted relief even where prejudice is found.  "[T]he unconstitutional shackling of a defendant results in prejudice *only* if the evidence of guilt is not 'overwhelming.'" *Cox v. Ayers,* 613 F.3d 883, 891 (9th Cir. 2010) (emphasis added); *see*

62

*also* *Napoli v. Sec'y, Dep't of Corr*, No. 615CV1372ORL41GJK, 2017 WL 6558264, at *7 (M.D. Fla. Oct. 20, 2017) (finding that although defendant was impermissibly shackled and tagged with a jail identification band during his trial, the error was harmless as "there [was] no probability that, absent the shackles or identification, [the jury] would have acquitted him because the evidence establishing Petitioner's guilt was overwhelming").

As described by the prosecution, the case against Moss was not one where a victim was kidnapped and raped and the question before the jury was whether or not the accused committed the offenses at issue. There is no doubt that if the offenses were committed, Moss was the perpetrator. At Moss' trial, however, as described by the prosecution, the question needing to be answered was simply "whether or not [the offenses] happened." Filing No. 10-19 at 15. The prosecution also reminded the jury that the only issue in the sexual assault count was consent and the only issue in the second count was "whether or not Moss restrained [K.E.] under terrorizing circumstances." *Id.* Put another way, the jury had to determine who they believed when finding that K.E. did or did not consent to sexual activities occurring in Moss' hotel room and whether Moss restrained K.E. under "terrorizing" circumstances despite K.E. and Moss being seen together in multiple locations where other people were present and K.E.'s own admission that she felt able to leave Moss' presence for a long period of time.

The state appellate court found that the evidence against Moss was "sufficient," but not overwhelming. Filing No. 10-3 at 9. More importantly, as noted previously, the appellate court found that it was *necessary* for the jury to determine that K.E. was more "credible" than Moss to find that Moss subjected K.E. to sexual penetration without her consent and to find that Moss "knowingly restricted K.E.'s movement by interfering

63

substantially with her liberty by means of force, threat, or deception under circumstances which made K.E. afraid or terrified." Filing No. 10-3 at 9-10 (emphasis added). A review of the record, as discussed previously, further establishes the closeness of the case and the importance of K.E.'s and Moss' credibility when determining Moss' guilt or innocence.

Ultimately, this was not a case where overwhelming evidence supported the jury's findings. Instead, the sufficient evidence that supported the jury's verdict was almost solely the testimonial evidence of K.E., who, according to the state appellate court the jury found to be more credible than Moss. And, due to the use of the Stun-Belt and the Shock Incident, the jury was not only capable of but was aware that Moss was shackled with a stun-style device and shocked by it.

As Moss' credibility was paramount to the outcome of his trial and as the trial court failed to explain what happened to the jury or otherwise inform the jury that the reason for the Shock Incident was not known to be Moss' fault, this Court finds that the unjustified use of the Stun-Belt throughout Moss' trial, especially and including its continued use after the Shock Incident, was prejudicial to Moss, was not harmless, and, instead, had a "substantial and injurious effect or influence in determining the jury's verdict." As such, the writ on Subparts One and Three shall be granted.

**B. Claim Two**

In Claim Two, Moss alleges the Phone containing material exculpatory impeachment evidence was destroyed by the State in bad faith, violating his due process rights under *Brady*. Filing No. 1 at 7, 34-36; Filing No. 18 at 16. Moss argues that the state appellate court's finding that *Youngblood* instead of *Brady* applies to this claim was erroneous, and, even if *Youngblood* did apply, their finding that the State's actions did not

64

constitute bad faith was a contrary or unreasonable application of clearly established Federal law and/or an unreasonable determination of the facts in light of the evidence presented.  *See* Filing No. 1 at 34-37 (citing 28 U.S.C. § 2254(d)).

Respondent disagrees, *see* Filing No. 14 at 26, as does this Court.

### 1. *Youngblood* supplies the appropriate standard

Moss contends that the state appellate court erred in not applying *Brady* to Claim Two because: (1) Moss filed a discovery motion seeking the Phone prior to its destruction; (2) the police knew the contents of the Phone were material and exculpatory as they listed the Phone in a search warrant; and (3) Moss told the prosecution though his discovery requests, at various hearings, and via his counsel that the Phone contained evidence that was material, exculpatory, and could be used for impeachment.  Filing No. 18 at 3-4, 12-15, 20.

It is well established under *Brady* that "the Government may not in good or bad faith suppress evidence favorable to the accused."  *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (citing *Brady,* 373 U.S. at 87).  Therefore, when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant.  Instead, a due process violation occurs whenever such evidence is withheld.  *See Brady,* 373 U.S. at 87; *Agurs,* 427 U.S. 97.  For nondisclosed evidence to fall under *Brady* its material exculpatory nature must be "*known to the others acting on the government's behalf*…including the police" as favorable to the accused.[36]  *Kyles v.*

---

[36] Moss cites to *Wearry v. Cain*, 577 U.S. 385 (2016), for the proposition that evidence qualifies as material for purposes of applying *Brady* when there is any reasonable likelihood that the evidence could have affected the judgment of the jury.  Filing No. 18 at 17.  However, Moss' citation is taken out of context.  The Court in *Cain* did not alter the *Brady*/*Youngblood* landscape.  Instead, the Court explained that *Brady* applies only where the evidence at issue is *known* to be "favorable to an accused," and that such evidence is material for *Brady* purposes when there is a reasonable likelihood that the evidence would affect the outcome.  *Cain*, 577 U.S. at 392 (citing *Brady*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 153-

*Whitley,* 514 U.S. 419, 437-38 (1995) (emphasis added).  Therefore, the applicability of *Brady* in part depends, "not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between clearly 'material exculpatory' evidence and 'potentially useful' evidence."  *Illinois v. Fisher*, 540 U.S. 544, 549 (2004); *see also Bugh,* 701 F.3d at 894 (if "the evidence in question is only potentially useful, as opposed to clearly exculpatory" then *Youngblood* and not *Brady* applies).

"The mere possibility that an item of undisclosed information *might have helped* the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *Agurs*, 427 U.S. at 109–10 (emphasis added).  Instead, a due process claim based on the failure to produce this type of evidence is governed by the Supreme Court's decisions in *California v. Trombetta*, 467 U.S. 479, 489 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 54–58 (1988).

Under *Trombetta*, "the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'" *United States v. Bohl*, 25 F.3d 904, 909–10 (10th Cir. 1994) (quoting *Trombetta*, 467 U.S. at 489).  In *Youngblood*, the Court "extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then

---

54).  Put another way, *Cain* addresses evidence, the contents of which are actually known, not evidence of which the contents are unknown to the government.

a defendant must show that the government acted in bad faith in destroying the evidence." *Id.* at 910 (quoting *Youngblood*, 488 U.S. at 58).

Moss first argues that *Brady* applies because he requested access to the Phone in discovery motions before its destruction, citing to *Illinois v. Fisher*, for the proposition that a discovery request puts the state on notice of evidence materiality, the requested evidence must be preserved, and the defense is not required to make an independent showing that the evidence has exculpatory value. Filing No. 18 at 16 (citing *Fisher*, 540 U.S. 544). Moss' interpretation of *Fisher* and his focus on the discovery request alone, however, is misguided.

In *Fisher*, the Court was asked to determine whether *Brady* or *Youngblood* applied to a lost/destroyed bag determined by the government to contain cocaine that the defendant had requested more than 10 years earlier in a discovery motion. *Fisher*, 540 U.S. at 545 (Pre-trial, Fisher had requested all physical evidence against him including the bag and its contents as he sought to obtain its independent testing, but due to Fisher failing to appear for a hearing while on bail, the case against him did not proceed for 10 years, during which time the bag and its contents were apparently lost or destroyed while in the government's possession). The *Fisher* Court, in applying *Youngblood*, clarified that the distinguishing fact between the application of *Brady* or *Youngblood* is not the nature of the request for the evidence by a defendant (such as a discovery motion), but the knowledge on the part of the government regarding the contents of the evidence once requested. Specifically, the *Fisher* Court explained that the court has "never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police," when dealing with "the failure of the State to

preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 547-48 (citing *Youngblood,* 488 U.S. at 57).

Moreover, Moss does not contend the State had access to the Phone's contents or any actual knowledge of the information it may or may not have contained. Instead, he argues that his general statements regarding the materiality and impeachment value of its contents put the State on notice of its actual contents. Knowledge of the materiality of evidence, however, cannot come solely from a defendant's claims about the exculpatory or material nature allegedly contained in lost or destroyed evidence. *Bugh,* 701 F.3d at 895; *see also United States v. Manjarrez,* 714 F. App'x 795, 796 (9th Cir. 2018) (applying *Youngblood* where a defendant contended that a destroyed cell phone contained exculpatory evidence showing that her calls were related to her bakery business rather than smuggling). The reality is that the State did not possess the Phone's PIN code and the State's attempts at accessing its contents were unsuccessful, resulting in its destruction and rendering its contents unknown to this day.[37]    As such, whatever information was contained within the Phone is plainly the sort of "potentially useful evidence" referred to in *Youngblood,* not the material exculpatory evidence addressed in *Brady.*

Moss' contention that the listing of the Phone on a search warrant established that the State knew of the materiality of the evidence contained in his Phone, rendering *Brady* applicable, fares no better. Filing No. 18 at 21. The issuance and execution of a search

---

[37] In discussing the issue of the search warrant in his Direct Appeal, Moss admitted the search warrant at issue designated the Phone as *possibly* containing relevant video or audio evidence, indicating the police had no actual knowledge of what evidence the Phone contained when the warrant was issued. Filing No. 10-5 at 16, 19, 23-24 (emphasis added).

warrant allows the police to collect "potential evidence," but does not imply that the police have any knowledge of the materiality or exculpatory value of the contents of the items to be searched. *See, e.g.*, *United States v. Maholy,* 1 F.3d 718, 722 (8th Cir. 1993) (describing one of the purposes of a search warrant as allowing for the collection of potential evidence).

In his final allegation, Moss relies on the case of *Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001), which he interprets as rendering *Brady* applicable where impeachment evidence against a prosecution's main witness is withheld by the prosecution, which in his case is the contents of the Phone which he alleges would impeach K.E.'s testimony. Filing No. 18 at 13-15, 17, 20-21. Moss' reliance on *Boyette,* however is flawed.

In *Boyette*, the withheld evidence at issue consisted of various written reports and documents (which could have been used as impeachment evidence of the State's main witness), the contents of which had been seen by and therefore were *known to the police prior to being withheld*. *Boyette*, 246 F.3d at 85 (emphasis added). The difference between *Boyette* and Moss' case is clear: In *Boyette*, the State knew the information contained in the withheld documents could be used for impeachment because they had access to and were able to read them. *Id*. Conversely, in Moss' case the actual contents of the Phone were, and remain, unknown. As such, *Youngblood*, not *Brady*, is applicable. *See, e.g.*, *Ferguson v. Roper*, 400 F.3d 635, 637 (8th Cir. 2005); *Jimerson v. Payne*, 957 F.3d 916, 925–26 (8th Cir. 2020).

As the application of *Brady* or *Youngblood* depends on such an evaluation, and as the state appellate court ultimately made the same distinction in rendering its decision,

*see* Filing 10-3 at 5-6, the state court of appeals did not misapply federal law in finding *Youngblood* applied to Moss' claims he now raises in Claim Two.

### 2. Moss does not establish the State acted in bad faith

Moss alternatively argues that, even if the bad faith standard in *Youngblood* applies, the state appellate court erred in finding the State did not act in bad faith when destroying the Phone and any potential exculpatory evidence it contained. Filing No. 18 at 16. Moss alleges the following provide evidence of the State's bad faith: (1) the State's forensics experts failed to properly research the Phone chip before taking the Phone apart resulting in its unnecessary destruction; (2) State counsel's comment at a hearing on January 4, 2016, before the trial court that Moss "will not be getting any cell phones as far as I am concerned," prior to the Phone's destruction, indicates the State intended to deny him access to the information contained in it; and (3) the State failed to request the PIN code from Moss or acknowledge it was unable to access the Phone's contents without it until after the Phone's destruction. *Id. at 19*.

To prevail on such a claim, Moss must establish the State's knowledge of the apparent exculpatory value of the evidence at the time of its destruction and evidence of bad faith in relation to the destruction.[38]  *Manjarrez*, 714 F. App'x at 796 (citing *Youngblood*, 488 U.S. at 58; *Trombetta*, 467 U.S. at 488). He does not.

---

[38] Although the Supreme Court has left open the possibility that due process can be violated by something other than intentional misconduct by a government agent, *see, e.g., Daniels v. Williams,* 474 U.S. 327, 334 n. 3 (1986) (indicating that there may be occasion to consider "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause" in the context of a § 1983 claim), under current Supreme Court and Eighth Circuit caselaw, bad faith in the context which Moss presents it requires more than gross negligence or reckless behavior. *See, e.g., United States v. Houston,* 548 F.3d 1151, 1155 (8th Cir. 2008) (officers' failure to download video evidence that could potentially assist the defense because they were not trained or instructed on how to do so as a matter of routine is evidence of potential negligence but not bad faith); *Bugh*, 701 F.3d at 895 (accidental destruction of potentially exculpatory evidence is not bad faith); *Iron Eyes*, 367 F.3d at 786 (negligent destruction of evidence with potential exculpatory value does not constitute bad faith).

70

Bad faith on the part of authorities has been described as involving "malice or a design to seek an unconscionable advantage over the defendant," *Canez v. Spearman*, No. 117CV01192LJOSABHC, 2018 WL 1801943, at *11 (E.D. Cal. Apr. 13, 2018) (internal quotations omitted), *report and recommendation adopted*, No. 117CV01192LJOSABHC, 2018 WL 11016657 (E.D. Cal. June 25, 2018), requiring a defendant to prove "official animus or a conscious effort to suppress exculpatory evidence" on part of the prosecution, *Trombetta*, 467 U.S. at 488. While deliberate omission or concealment of the existence of potential evidence is indicative of bad faith, *see Jimerson*, 957 F.3d at 926, mere negligence is not, *see United States v. Heiser*, 473 Fed. App'x. 161 (3d Cir. 2012) (the failure of seized drive and loss of back-up copy did not support a due process violation, absent showing of "an intentional act to gain a tactical advantage," any "official animus" toward the defendant, or "a conscious effort to suppress exculpatory evidence").

First, Moss alleges that the State failed to "put preservation of evidence over *negligent* 'last resort' destructive testing" of the Phone including failing to research other non-destructive tests which could have been performed as evidence of bad faith. Filing No. 18 at 19, 22–23 (emphasis added). However, as previously noted, bad faith requires more than negligence. *See, e.g., Houston*, 548 F.3d at 1155 (8th Cir. 2008); *Bugh*, 701 F.3d at 895; *United States v. Iron Eyes*, 367 F.3d 781, 786 (8th Cir. 2004). The fact that other states issue a warrant listing the chip off procedure as potentially being used, *see, e.g.*, *State v. Law*, 12 Wash. App. 2d 1066, *2 (2020), or that other avenues for accessing data exist, does not establish that the failure to utilize other procedures or the failure to issue a warrant before utilizing the chip off procedure is evidence of bad faith without evidence in the record of malicious intent, which is not supported in the record here.

71

Next, Moss points to what he contends is the State's refusal to turn over the Phone to him during multiple hearings as evidence of the State's intentional plan to deprive him access to the Phone's contents. In conjunction with this argument, Moss contends that the State should have, but did not, ask him for the PIN code before utilizing the chip-off procedure.

The State Appellate Court addressed this argument fully, finding that:

Moss also repeatedly points out that the State never asked him for the PIN code to the [P]hone, and argues that had it done so, he would have gladly provided that information because he, too, wanted the information on the [P]hone to be accessed. In conjunction with this argument, Moss also notes the prosecutor's comment at a hearing regarding the [P]hone that Moss "will not be getting any cell phones as far as I am concerned." He claims that this comment combined with the fact that the State never asked him for the PIN code establish that the State acted in bad faith.

We first observe that the prosecutor's comment was made at the January 4, 2016, hearing in response to Moss' request for the [P]hone to be released to him personally, rather than allowing it to be examined by an expert of his choosing. After the State's comment that Moss would not be getting the [P]hone, the district court explained to Moss' counsel that the State "can't simply turn over the [P]hone to you." There was a discussion with the court indicating that Moss could file a motion requesting to have an independent expert analyze the [P]hone, but Moss' argument appeared to center around his request for the State to physically give him the [P]hone. The State never objected to providing the [P[hone to an independent expert for analysis; in fact, the State specifically agreed to release the [P]hone to an expert of Moss' choosing for examination but objected to releasing the [P]hone to Moss himself.

Moss cites to no authority which would allow the district court to authorize the release of a piece of physical evidence to the defendant directly, and we have found none. And we do not interpret the State's comment as a refusal to allow the [P]hone to be inspected by someone other than a law enforcement officer selected by the State. Instead, the State objected to giving the [P]hone to Moss because he knew the PIN code and could potentially erase or change information stored on the [P]hone. Although the State was ultimately unable to gain access to any information on the [P]hone, its objection to allowing Moss to personally have access to the [P]hone was not unreasonable or in bad faith.

72

> Further, Moss repeatedly notes that no one asked him for the PIN code for the [P]hone, which he claims he would have provided.  He again provides no authority that the State was required to ask him for the code, and as the State observed at one hearing on this issue, it could not require him to provide that information.  In addition, Moss was present during numerous hearings where the State described its attempts at bypassing the PIN code requirement on Moss' [P]hone.  If Moss was as interested in accessing the information on the [P[hone as he now claims he was, he was aware that the PIN code could assist in unlocking the [P]hone and could have offered to provide it.
>
> Having found that the district court's determination that the State did not act in bad faith is not clearly erroneous, we conclude that the court did not err in denying the motion to dismiss.

Filing No. 10-3 at 6–7.

A review of the record establishes that Moss may not have been aware of the difficulties with accessing the information contained in the Phone, or that it had not been accessed, until after its destruction.  At the hearings before the Phone's destruction, the State's counsel indicated she would not be releasing the Phone directly to Moss in response to his request for discovery, but there is nothing in the record establishing Moss was aware of any issues with accessing the Phone that may have been resolved by the PIN code.  *See, e.g.*, Filing No. 10-14 at 11-12 (counsel for the prosecution stated that she was unsure if a search of the Phone had occurred so she did not know if it contained anything of evidentiary value, but did not mention why she was unaware of the Phone's contents).  Instead, the hearings referenced by the state appellate court as evidence Moss knew occurred after the Phone's destruction.  *See* Filing No. 10-14 at 16–17.

However, even if the appellate court's finding regarding Moss' awareness (prior to the Phone's destruction) of the State's lack of access to the Phone's contents was erroneous, ultimately its error is harmless.  The record establishes that the State did not want the Phone destroyed and good faith can be inferred from the State's attempts to

obtain its contents via its various attempts at working around the PIN code.  *See, e.g.*, *United States v. Manjarrez*, 714 F. App'x 795, 796 (9th Cir. 2018) (inferring good faith from evidence that the government was attempting to secure a search warrant for a cell phone at the time it was accidentally destroyed).   And, even if Moss was willing to provide the PIN code, he presents no evidence suggesting any official animus against him, of a plan by the State to gain tactical advantage, or the State's actual knowledge of the Phone's contents.

Therefore, while a review of the record establishes that the prosecution may not have notified Moss that it could not access the contents of the Phone without the PIN code until after it was destroyed, or that there may have been other procedures allowing access to its contents without its destruction (and even if the government acted negligently by failing to pursue those other avenues), considering the record and the legal arguments raised by Moss, this Court finds the state appellate court's decision was not contrary to, or an unreasonable application of, clearly established federal law, or based upon unreasonable determinations of facts in light of the evidence before them.  28 U.S.C. § 2254(d)(1), (2).  For these reasons, Claim Two must be denied.

## C.  Claim Three

In Claim Three, Moss argues that he was denied due process because the trial court imposed an excessive sentence based on a presentence investigation report ("PSR") containing incorrect information about his criminal history.  Filing No. 1 at 44-49; Filing No. 6 at 2.  He also argues he was denied effective assistance of counsel as his trial counsel failed to obtain the PSR for him to review.  Filing No. 1 at 44–49; Filing No. 6 at 2.

74

Moss did not present any of these arguments in his Direct Appeal.  *See* Filing No. 10-5.  Instead, he alleged the opposite, arguing that based on the information contained in the PSR he should have been sentenced to probation and the state district court abused its discretion by not relying on the PSR when sentencing him.  Filing No. 10-5 at 49-54.

As the claims raised in Claim Three are not the same claims raised to the state courts, they were never fairly presented, and the time to do so has passed, *see supra* (discussing fair presentation in relation to Claim One), the merits of Claim Three cannot be reviewed as the claim is procedurally defaulted.  Therefore, Claim Three is denied.

**D.  Claim Four**

In Claim Four, Moss contends he was denied a fair trial because: (1) the trial court erred in sustaining the State's objections to the testimony of witnesses Rankin, Pollard, Owens, and Aurterburn; (2) trial counsel failed to endorse and introduce the testimony of Pollard, Aurterburn, Owens, and Rankin at Moss' trial; (3) trial counsel failed to gain proper out-of-state service of witness Pollard; and (4) Moss' counsel failed to make an offer of proof regarding the testimony of excluded witnesses Pollard, Aurterburn, Owens, and Rankin.  Filing No. 1 at 50-53.

As an initial matter, no claims were asserted by Moss relating to either Rankin or Owens in his Direct Appeal or his PCM.  *See* Filing Nos. 10-5, 10-7, 10-8, 10-10, and 10-11.  As such, Subparts One, Two, and Four, to the extent they relate to Rankin and Owens, shall be denied as they are procedurally defaulted because they were not fairly presented to the Nebraska courts and the time to do so has passed.

### 1.  Subpart One

In the remainder of Subpart One, Moss argues he was denied a fair trial because the trial court sustained the State's objections to the testimony of witnesses Pollard and Aurterburn.  Filing No. 1 at 53.  While Moss raised a related claim in his Direct Appeal, it is not the same claim he now raises as there he argued that his counsel, not the court, erred by failing to disclose Aurterburn.  *See* Filing No. 10-5 at 46 (indicating that his counsel mistakenly believed Aurterburn did not have to be disclosed because he was a rebuttal witness).  In relation to Pollard, there is no indication in the record that Moss raised any claim of trial court error relating to the state's objection to Pollard's testimony.

As Subpart One was never raised before any state court and the time to do so has passed, the claim was not fairly presented to the state courts, is procedurally defaulted, and outside the scope of review by this Court.  Therefore, Subpart One shall be denied.

### 2.  Subparts Two and Three

In Subpart Two, Moss submits his counsel was ineffective by failing to endorse and introduce the testimony of Pollard and Aurterburn at trial to aid his defense.  Filing No. 1 at 50.  In Subpart Three, Moss argues his counsel was ineffective for failing to obtain proper out-of-state service of witness Pollard.  *Id.* at 51.

In relation to Subpart Two, Moss brought this claim as to both Pollard and Aurterburn in his Direct Appeal, *see* Filing No. 10-5 at 41, 45-46, but the Nebraska Court of Appeals ultimately found that the record relating to Aurterburn's testimony was insufficient to address this claim.  *See*  Filing No. 10-3 at 15.  Because the merits of the Aurterburn claim were not addressed in Moss' Direct Appeal, were not again raised in his PCM, *see* Filing No. 10-7, and the time to do so has passed, the claim as to Auterburn

76

was not fairly presented, is procedurally defaulted, and is outside the scope of review by this Court. *See Akins v. Kenney*, 410 F.3d 451, 454 (8th Cir. 2005).

The merits of Subparts Two and Three relating to Pollard were presented in Moss' Direct Appeal and are both exhausted. *See* Filing No. 10-3 at 15-16; Filing No. 10-5 at 46-47; Filing No. 10-7 at 12–13. In both Subparts, Moss argues that he received ineffective assistance of counsel when his counsel failed to obtain a proper out of state subpoena resulting in Pollard's failure to attend or provide testimony at his trial. Filing No. 1 at 51. Although Subpart Three relates to trial counsel's failure to properly subpoena Pollard and Subpart two relates to trial counsel's failure to produce Pollard to testify, both Subparts address the same issue relating to prejudice—the effect of the lack of Pollard's testimony on the outcome of Moss' trial as governed by *Strickland v. Washington*, 466 U.S. 668 (1984).

Under *Strickland*, to prevail on a claim of ineffective assistance of counsel a federal habeas petitioner must demonstrate both that his counsel's performance was deficient and that such deficient performance prejudiced the petitioner's defense. *Strickland*, 466 U.S. at 687. *Strickland* prejudice requires a petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The state appellate court found that Moss failed to establish *Strickland* prejudice as he did not establish that the results of his trial would have been different had Pollard testified. Filing No. 10-3 at 15-16. Moss argues this determination is in error as he did not need to establish prejudice; because K.E. was the state's main witness and K.E.'s credibility was essential to securing Moss' conviction, Pollard's testimony having been

77

omitted was inherently prejudicial. Filing No. 1 at 51. Specifically, he contends Pollard would have provided impeachment testimony contradicting "MANY of K.E.'s statements . . . including allegations of her being held against her will, and alleged poor treatment of their . . . dog." *Id.*

In support, Moss cites to *Holley v. Yarborough*, 568 F.3d 1091 (9th Cir. 2009), arguing that *Yarborough* establishes that a criminal defendant is prejudiced by the omission of testimony which, if allowed, would discredit the accuracy and reliability of material witness testimony used against the defendant, and that the exclusion of evidence demonstrating a victim's propensity to fabricate has a substantial and injurious effect or influence on the defendant's guilty verdict and is prejudicial. *See* Filing No. 1 at 54. Moss' reliance on *Yarborough* is misplaced.

First, as *Yarborough* is a Ninth Circuit case, this Court need not follow its holding. More importantly, in *Yarborough*, the court found that the exclusion of testimony was prejudicial as the victim's "accuracy and truthfulness" were key elements of the State's case, and as the jury might have received a "significantly different impression" of the victim's credibility had the defendant been allowed to introduce evidence of the victim's past statements and cross-examine her about them. *Yarborough*, 568 F.3d at 1101. This is not the case regarding Pollard's purported testimony.

The state appellate court found that Pollard's testimony would not have impeached K.E.'s testimony regarding her false imprisonment claim because K.E.'s testimony regarding her fear and inability to leave occurred after Pollard interacted with her. Filing No. 10-3 at 16. And, aside from K.E. failing to testify about Pollard's presence at Pham's house, his testimony largely confirmed K.E.'s. *Id.* Moreover, while the state appellate

78

court did not discuss the alleged treatment of the dog in its opinion, even if Pollard had testified that the dog was treated well by Moss (contradicting K.E.'s testimony), this sole contradiction is unlikely to have any effect on the remainder or K.E.'s testimony.  Finally, Moss' generalized statement that his counsel failed to expound upon other ways that Pollard's testimony would have purportedly impeached K.E.'s testimony is simply an unsupported conclusion.

A federal court must presume factual determinations made by a state court are correct, unless a petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Moss supplies no such evidence.  As such, Subparts Two and Three relating to Pollard shall be denied.

### 3.  Subpart Four

In Subpart Four, Moss concludes his counsel was ineffective for failing to make an offer of proof regarding the testimony of excluded witnesses Pollard and Aurterburn.  Filing No. 1 at 62; Filing No. 18 at 29.  On direct appeal, the state appellate court found that this claim lacked merit as follows:

> Moss argues that his trial counsel was ineffective in failing to make an offer of proof regarding the testimony of excluded witnesses Peter Pollard and Austin Arterburn.  The record affirmatively refutes this claim.  The record establishes that trial counsel did make an offer of proof with respect to both witnesses.  Moss first called an investigator hired by the defense who interviewed Pollard in February 2016.  The investigator testified as to what Pollard told him about what he observed on the night of May 14, 2015, into the morning of May 15.  Moss also made an offer of proof by calling Arterburn to explain the testimony he would have given if he had been permitted to testify at trial.

Filing No. 10-3 at 17.

A review of the record supports the state appellate court's factual findings.  *See* Filing No. 10-18 at 30-38, 55-59.  Therefore, as there is no basis for this Court to find the

79

state appellate court's findings were based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2), Subpart Four shall be denied.

### E.  Claim Five

Moss argues that the trial court erred by not discharging his case for a speedy trial violation.  Filing No. 6 at 2.

Prior to trial, Moss filed a motion for discharge, alleging both federal and state constitutional violations and state statutory violations of his right to a speedy trial.  Filing No. 10-12 at 149-50.  Following a hearing, the trial court denied Moss' motion finding his statutory claim lacked merit as the State still had "at least 56 days remaining…to bring [Moss] to trial," he had waived his statutory right to a speedy trial by requesting continuances, and that his constitutional claims also failed as after balancing all of the factors a court must consider none were indicative of a constitutional violation.  Id. at 154-60.  Petitioner did not appeal the trial court's order, instead raising his speedy trial claims on direct appeal.  See Filing No. 10-5 at 17-18.

On appeal, the state appellate court found that it had no jurisdiction over Moss' state statutory speedy trial claim because Moss had not appealed the trial court's order in the 30-days after the trial court denied his motion for discharge as required by Nebraska law.  Filing No. 10-3 at 5 (citing State v. Williams, 761 N.W.2d 514, 519–20 (Neb. 2009).  And, the court found it need not address his constitutional speedy trial claims as, although Moss' pretrial motion alleged both state statutory and constitutional speedy trial violations, his appeal failed to address his constitutional claims.[39]  Id.

---

[39] Although Moss' Direct Appeal does contain a heading seeking discharge due to "violations of Moss' statutory and constitutional rights to a speedy trial," the argument section only discusses his state statutory claim relating to the trial court's calculation of excludable time periods.  Filing No. 10-5 at 17-18.

Moss' statutory claims are not properly before this Court as they are solely a matter of state law.  *See Nance v. Norris*, 392 F.3d 284, 289 (8th Cir. 2004) ("errors of state law are not cognizable in federal habeas courts").  And, Moss' constitutional claims are procedurally defaulted because Moss failed to raise them in his Direct Appeal.  *See* Filing No. 10-7 at 1, 4-13.

For these reasons, Claim Five shall be denied.

## F.  Claim Six

Moss asserts that the trial court erred in not granting a directed verdict for insufficiency of evidence,[40] *see* Filing No. 1 at 19; Filing No. 18 at 33, alleging that, due to ineffective assistance of his trial counsel, he was unable to present any impeachment evidence regarding K.E.'s testimony or any evidence of his innocence, resulting in a fundamental miscarriage of justice.  Filing No. 18 at 33.  The state appellate court

---

[40] In addressing Moss' sufficiency claim the state appellate court first found that it was unclear whether Moss' motion to dismiss at the close of the State's evidence was intended to be a motion for directed verdict based upon the following:

> At the close of the State's evidence, rather than moving for a directed verdict, Moss made an oral motion to dismiss.  This motion could be considered the equivalent of a motion for directed verdict, but in arguing his motion, Moss referred back to the incident involving the electronic device, and not the sufficiency of the evidence.  The State responded to the motion on the grounds Moss asserted but also as to whether the State presented prima facie evidence to support the charges.  And the district court concluded that a prima facie case had been made.  Thus, the record is unclear as to whether Moss' motion to dismiss at the close of the State's evidence was intended to be a motion for directed verdict based upon the State's alleged failure to present a prima facie case.

Filing No. 10-3 at 8.

> The Court of Appeals, assuming Moss' motion was a motion for directed verdict ultimately found:

> Moss has waived any challenge to the denial of his motion because he presented evidence after the motion was denied.  In a criminal trial, after a court overrules a defendant's motion for a dismissal or a directed verdict, the defendant waives any right to challenge the trial court's ruling if the defendant proceeds with trial and introduces evidence, but the defendant may challenge the sufficiency of the evidence for the convictions.  *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016).  Accordingly, to the extent Moss made a motion for a directed verdict at the close of the State's case-in-chief, a challenge to the denial of that motion has been waived.

*Id.* at 8–9.

81

disagreed, finding that sufficient evidence in the form of K.E.'s "credible" testimony supported Moss' first degree sexual assault and first degree false imprisonment convictions and that no sufficiency analysis was required to establish Moss' protection order violation as Moss conceded to the violation.  Filing No. 10-3 at 9–10.

The Court's review of a habeas petition that alleges insufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979).  "Under *Jackson*, a habeas petitioner is entitled to relief if [the court] conclude[s] that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Brende v. Young*, 907 F.3d 1080, 1085 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 74 (2019), *reh'g denied*, 140 S. Ct. 634 (2019) (quoting *Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015)).   A court does not re-weigh the evidence when applying this standard, resolution of all inconsistencies must be resolved in favor of the prosecution, and relief is granted only if the conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard was both incorrect and unreasonable.  *Id.*

Here, while the state appellate court did not cite *Jackson v. Virginia* when addressing this claim, *see* Filing No. 10-3 at 9–10, "[a] reasonable application of established federal law 'does not require citation of [United States Supreme Court] cases—indeed, it does not even require *awareness* of [the] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.'"  *See Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir. 2005) (quoting *Early v. Packer*, 537 U.S. 3, 8, (2002)) (emphasis in original).  The state appellate court correctly applied the essence of *Jackson v. Virginia* to the question of whether the evidence was sufficient to support [Moss']

conviction for first degree sexual assault and first-degree false imprisonment,[41] in an objectively reasonable manner.  As such, neither the reasoning nor the result contradicts *Jackson v. Virginia*.

Moss also fails to establish that the adjudication of the claim by the state appellate court resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  The court found that the State presented evidence from which the jury could have found the lack of consent requirements for first degree sexual assault and that the State presented evidence from which the jury could have found that Moss knowingly restrained K.E. under terrorizing circumstances as required for first degree false imprisonment, citing to K.E.'s testimony in both instances.  The facts cited are confirmed by the trial and enhancement hearing transcripts.  Thus, the state appellate court could, and did, find the evidence sufficient to support Moss' convictions.

Finally, this Court cannot look at the impeachment evidence Moss claims exists but was not presented at his trial and then reassess the credibility of trial witnesses considering the alleged contents of the unpresented evidence.  *See Thiel v. Schuetzle*, 200 F.3d 1120, 1122-23 (8th Cir. 1999).  Where a claim was adjudicated on the merits in state court, pursuant to Section 2254(d)(1) and the United States Supreme Court's holding in *Cullen v. Pinholster*, further evidentiary development of the claim in federal court is barred, limiting review of the claim "to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 181 (2011).

---

[41] As Moss conceded the protection order violation, the state appellate court correctly determined no sufficiency analysis was required with respect to his conviction for violation of a protection order.  *See* Filing No. 10-3 at 10; see also Filing No. 10-5 at 30 (admitting a protection order violation).

Given the foregoing, Moss is not entitled to relief on Claim Six, and therefore it shall be denied.

## G.  Claim Seven

Moss raises six additional ineffective assistance of counsel claims in Claim Seven, each of which is governed by the two-part test set forth in *Strickland*, as previously discussed.

### 1.  Subpart One – Failure to offer the testimony of Jennifer York

Moss argues that Jennifer York "would have testified to her examination of [the] damaged [P]hone and the level of destruction not being within industry standards" but did not due to his counsel's ineffectiveness.  Filing No. 1 at 60.  Specifically, he contends his counsel failed to properly endorse and introduce York's testimony, failed to properly subpoena her to testify, and failed to make an offer of proof regarding her testimony.[42] Filing No. 18 at 29.

In addressing his ineffective assistance claim, the state appellate court found that Moss failed to establish prejudice under *Strickland* as the introduction of York's testimony would not have changed the outcome of Moss' trial.  Filing No. 10-3 at 14.  Moss now reiterates the same arguments presented to the state courts: that York would have provided an alternative theory as to what happened to the Phone, providing reasonable doubt as to the government's intentions when the decision was made to use a recovery procedure which might destroy it, and her testimony would have confirmed that the government could have accessed the information stored on the Phone without destroying

---

[42] Moss also appears to allege that the trial court erred in sustaining the government's objection to York's introduction.  *See* Filing No. 18 at 29.  To the extent he intends to raise such a claim here, it must be dismissed as procedurally defaulted as Moss never raised this claim in his Direct Appeal.  *See* Filing No. 10-5.

84

it.  Filing No. 18 at 34.  However, none of Moss' arguments provide a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[43]  As noted by the state appellate court, York's testimony regarding other optional procedures for accessing the information in the Phone without its destruction, while it may be evidence of negligence, it is not evidence of bad faith on the government's part.  Filing No. 10-3 at 14; *see also* Bugh,701 F.3d at 895 (accidental destruction of potentially exculpatory evidence is not bad faith); *Iron Eyes*, 367 F.3d at 786 (negligent destruction of evidence with potential exculpatory value does not constitute bad faith).

Ultimately, as there is no basis for finding that the state appellate court's decision resulted in an unreasonable application of law or fact under 28 U.S.C. § 2254(d), Subpart One shall be denied.

## 2.  Subpart Two – Failure to provide a meaningful defense

Moss alleges that his trial counsel was ineffective for failing to provide a meaningful defense.  Filing No. 1 at 61.  While Moss alleged a failure to provide a meaningful defense claim in his Direct Appeal, *see* Filing No. 10-3 at 14, because his argument relied solely on two other ineffective assistance claims (counsel's failure to successfully offer cell phone records into evidence at trial and his failure to properly subpoena and identify two witnesses), the state appellate court did not separately address this claim and instead denied those claims separately.  *Id.*

---

[43] It appears Petitioner intends to argue that York's testimony would have supported his *Brady* claim relating in Claim Two.  To that extent, his argument regarding the York testimony was addressed in the section addressing his Ground Two claim.  *See supra.*

85

Here, to the extent that Moss raises the same claim he raised in his Direct Appeal, he is not entitled to relief as seen *infra* addressing Subparts Three and Four of Claim Seven (addressing the same claims he raised in support of his meaningful defense claim in his Direct Appeal). If, however, Moss is raising a claim separate from those Subparts, such a claim would be procedurally defaulted because they were not fairly presented to the state courts. For these reasons, Subpart Two shall be dismissed.

### 3. Subpart Three – K.E.'s cell phone records

Moss argues he was denied effective assistance of trial counsel because his trial counsel failed to lay a proper foundation to introduce K.E.'s cell phone records, which could have been utilized to: (1) impeach K.E.'s claim that she had no contact with Moss after the Incident; (2) open up a line of questioning regarding the content of each call K.E. made to Moss totaling over four hours between the Incident and the time of Moss' arrest including requiring K.E. to explain why she would contact Moss after the incident if she was "so scared of him"; and have her explain the contents of the text messages she sent Moss. Filing No. 18 at 35. Upon review of the record, there is no support that Moss was prejudiced under *Strickland* due to the omission of the cell phone records.

During Moss' direct examination at his trial, his counsel attempted to admit cell phone records (hereinafter "Trial Exhibit 39"), *see* Filing No. 10-20 at 10-29, arguing they would impeach K.E.'s testimony that she had no telephonic communication with Moss following the Incident. Filing No. 10-18 at 155. The trial court found that Trial Exhibit 39 could not be admitted as no foundation was laid which would allow the records to be

submitted into evidence.[44] Filing No. 10-18 at 157-58. However, even if Trial Exhibit 39 had been admitted into evidence it did not support the claim that K.E. and Moss had spoken for over four hours after the Incident. Trial Exhibit 39 is a Verizon business record containing calls between April 25, 2015, and May 15, 2015, with the last call listed taking place on May 15, 2015 at 14:46, and none of the calls appear to be to or from Moss' stated phone number of 402-807-6151. Filing No. 10-20 at 10-29.

In his Direct Appeal, Moss' made the same error regarding the contents of Trial Exhibit 39 and argued it "contained a 58 minute call between [K.E.] and Moss the day after the incident and over 4 hours of phone calls between the parties over the next 2 months prior to his arrest." Filing No. 10-5 at 25, 43-44. The state appellate court declined to address the merits finding that the record was insufficient to address it. *See* Filing No. 10-3 at 15.

In his PCM, the claim was again raised, and the same error was made regarding the contents of Trial Exhibit 39. Filing No. 10-8 at 44. Moss also alleged his trial counsel was ineffective for "failing to pursue introduction of [Trial Exhibit 39] after the prosecutor[']s sustained foundational objection" and for failing to subpoena a custodian of records to lay a proper foundation for their introduction. Filing No. 10-8 at 48–49. He contended he was prejudiced by his counsel's errors as Trial Exhibit 39 would have established K.E. presented untruthful testimony regarding her communications with him, Filing No. 10-8 at 49, and that but for his counsel's failure the jury would have been presented with clear evidence that K.E. was not truthful about her communications with him. Filing No. 10-8

---

[44] Of note, Moss' trial counsel did not submit or attempt to submit any other cell phone records as evidence at Moss' trial. *See* Filing Nos. 15, 16, 17, 18, 19, and 20.

at 51.  And finally, he alleged that he was in possession of K.E.'s cell phone records showing four and one-half hours of calls between K.E. and Moss in the two months following the Incident (the "New Phone Records") and Facebook messages of K.E. reaching out to Moss "continually" after the Incident.[45]  Filing No. 10-8 at 52.

The state appellate court rejected Moss' claims as follows:

Moss also asserts that he was entitled to an evidentiary hearing on his claim that his trial counsel was ineffective in failing to successfully gain admittance of cell phone records into evidence at trial.  Moss argues that the cell phone records which trial counsel offered would show more than 4 hours of conversation between him and K.E. in the 2 months following the May 14 and 15, 2015, incident.  Moss argues that these records would therefore contradict K.E.'s testimony that she did not talk to him on the phone after the incident occurred, impairing her credibility with the jury.

The cell phone records Moss' [sic] trial counsel offered into evidence at trial do not indicate the owner of the cell phone but consist of 20 pages depicting cell phone calls made and received between April 25 and May 15, 2015. Thus, the records, on their face, do not support Moss' allegation that between May 16 and July 27, he and K.E. talked on the phone for more than 4½ hours total.  Nor would the cell phone records contradict K.E.'s testimony that she did not have phone conversations with Moss after the incident, which ended on May 15, because the records contain no information beyond May 15.

Moreover, when trial counsel was attempting to lay foundation for these records at trial, he asked Moss to confirm K.E.'s phone number, and Moss replied that "it was 775-857 something" but that he did not recall the rest of the number.  The cell phone records trial counsel offered into evidence do not list any calls to or from a phone number that begins with 775-857.  Thus, these records would not assist in establishing that Moss and K.E. spoke on the phone before, during, or after the relevant events.

If there is a second set of cell phone records depicting calls made at later dates as Moss suggests in his brief, they were not offered into evidence at trial.  Moss' claim in his postconviction motion does not allege that trial counsel was ineffective in failing to offer this set of records into evidence; rather, he alleges only that trial counsel failed to successfully gain admittance of cell phone records that were offered into evidence because

---

[45] It is unclear to this Court if Moss' reference in his PCM is to the same records as contained in Trial Exhibit 39 or additional previously undisclosed cell phone records.

88

he failed to lay proper foundation.  And only one exhibit containing cell phone records was offered at trial.  Accordingly, Moss has failed to establish that he was prejudiced by counsel's failure to gain admittance of the cell phone records into evidence at trial.  Therefore, the district court did not err when it denied postconviction relief on this claim without an evidentiary hearing.

Filing No. 10-4 at 6.[46]

In his PCM PFR, Moss again raised his claims regarding K.E.'s cell phone records, but, for the first time, he attached what the state appellate court referred to as the "second set of cell phone records" depicting calls from May 15, 2015, through August 1, 2015. *See* Filing No. 10-11 at 7-9, 22-63.

Here, Moss again raises the claim that his trial counsel was ineffective for failing to lay a proper foundation for Trial Exhibit 39, but he also appears to seek review of this claim in conjunction with the New Phone Records, showing calls from later dates.  *See* Filing No. 1 at 61; Filing No. 18 at 39-40.  As an initial matter, this Court cannot consider any argument relating to the New Phone Records as they were not given a full round of review by the state courts as required for fair presentment.  Therefore, any claim seeking to address them is procedurally defaulted.

Regarding the exhausted portion of his argument, like he did before the state courts, Moss claims that his trial counsel was ineffective for failing to successfully gain admittance of Trial Exhibit 39.  Filing No. 10-18 at 144, 155-56.  However, a review of the record confirms the state appellate court's decision: that there is nothing in Trial Exhibit 39 that would alter or otherwise change the outcome of Moss' trial as Trial Exhibit 39

---

[46] The cell phone records his trial counsel failed to admit were the records contained in Trial Exhibit 39, not the New Phone Records containing calls from later dates which Moss has filed in conjunction with his Motion to Supplement. *Compare* Filing No. 10-20 at 10-29, *with* Filing No. 45 at 72-110.

contains no evidence of any continued communication between K.E. and Moss after the Incident. *See* Filing No. 10-20 at 29.

Given the record before the Court, Moss cannot establish that the decision of the state appellate court was contrary to, or involved an unreasonable application of, *Strickland* because Moss cannot establish that but for his counsel's failure to lay proper foundation to admit the cell phone records from Trial Exhibit 39 at his trial, he would have been acquitted. For these reasons, Subpart Three fails in its entirety either on the merits or as procedurally defaulted and must be denied.

### 4. Subpart Four – Failure to document

Moss argues he was denied the effective assistance of counsel because counsel failed to properly document the exculpatory nature of the information in his destroyed Phone. Filing No. 18 at 35. The state appellate court rejected this claim on the merits on direct appeal. Filing No. 10-3 at 15.

Moss presents no clear and convincing evidence that the decision of the state appellate court was contrary to, or involved an unreasonable application of, *Strickland*. In fact, Moss does not allege that his counsel attesting to the importance of the information contained on the Phone would have changed the outcome of his trial in any way. As such, Subpart Four shall be denied.

### 5. Subpart Five – Failure to call prosecutor Hessig as a witness

Moss argues he was denied the effective assistance of counsel because trial counsel failed to call prosecutor Hessig as a witness at the hearing on his motion to dismiss regarding her alleged requests for a PIN code for the Phone. Filing No. 1 at 62. This Subpart was rejected on the merits (as previously discussed in Claim Two), as the

90

record refutes Moss' claim that he was unaware of the government's need for the Phone's PIN code and that the government was under no obligation to ask for it, rendering any testimony Hessig may have provided as irrelevant to the outcome of Moss' trial. Filing No. 10-3 at 15.

While, as previously discussed when addressing Claim Two, this Court is not convinced by the state appellate court's finding that Moss was aware of the government's need for the PIN prior to the Phone's destruction, it does not affect the finding that Moss failed to establish prejudice under *Strickland* in relation to Hessig's purported testimony as Moss does not explain how Hessig's testimony, even if she testified that the government did not ask Moss or his counsel for the Phone's PIN code, would have changed the outcome of his trial.[47]

For these reasons, Subpart Five shall be denied.

### 6. Subpart Six – Failure to withdraw as Moss' counsel and provide testimony

Finally, Moss argues he was denied effective assistance because his trial counsel failed to withdraw from his representation and testify at the motion to dismiss hearing regarding the lack of request by the State for the Phone's PIN code. Filing No. 6 at 3. On direct appeal this claim was rejected. Filing No. 10-3 at 17.

This Court finds that the state appellate court's decision was not contrary to, nor involved an unreasonable application of, federal law as set forth in *Strickland*. Moss

---

[47] Moreover, whether Moss was or was not aware of the need for the Phone's PIN code, Moss does not raise, and the Court is not aware of, any holding requiring the State to ask for the PIN code for a criminal defendant's phone when trying to recover the evidence it may contain, even if the defendant indicates the phone is of evidentiary value to him. In fact, some courts have determined that the government cannot compel a criminal defendant to provide PIN, passcode, or other access to a defendant's cell phone as to do so may violate the defendant's Fifth Amendment right against self-incrimination. *See United States v. Brown*, No. 23-3074, 2025 WL 223881, at *12 (D.C. Cir. Jan. 17, 2025) (citing *Kastigar v. United States*, 406 U.S. 441, 445, (1972)).

91

cannot establish that, but for his counsel's failure to withdraw from his representation and testify at the hearing on the motion to dismiss regarding the lack of request by the prosecutor for the Phone's PIN code, he would have been acquitted. Therefore, Moss has failed to establish prejudice under *Strickland*. For this reason Subpart Six shall be denied.

## V. CERTIFICATE OF APPEALABILITY

Respondent does not require a certificate of appealability to appeal the Court's decision. Moss does, however, and 28 U.S.C. § 2253(c)(2) provides that a certificate of appealability should be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." This requires a petitioner to demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotation omitted).

In this case, Moss has failed to make a substantial showing of the denial of a constitutional right on all claims except Claim One, Subparts One and Three, upon which the writ has been granted. The Court is not persuaded that the remainder of the claims raised in Moss' Petition are debatable among reasonable jurists, that a court could resolve the claims differently, or that the claims deserve further proceedings. Accordingly, the Court will not issue a certificate of appealability in this case.

IT IS THEREFORE ORDERED THAT:

1. Moss' Petition for a Writ of Habeas Corpus, Filing No. 1, is granted in part and denied in part.

A.   The Court finds that Claim One, Subparts One and Three warrant habeas relief.  The trial court abused its discretion by utilizing the Stun-Belt without making findings on the record regarding its use, which prejudiced Moss, resulting in a substantial and injurious effect on the jury's verdict at his trial.

B.   The Court finds that all remaining Claims and Subparts alleged in the Petition do not warrant relief for the reasons set forth herein and are hereby denied with prejudice.

2.  Execution of the writ is stayed for 90 days from the date this Memorandum and Order becomes final (including any appeals that may be taken) to permit the State to commence a new trial on Moss' charges.  If the State fails to comply, Respondent must release Moss from custody.

Dated this 4th day of March, 2026.

BY THE COURT:

Joseph F. Bataillon
Senior United States District Court